2021 IL App (1st) 191065-U

No. 1-19-1065

Order filed June 3, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 02 CR 31134 |
| | ) | |
| PIERRE MONTANEZ, | ) | Honorable |
| | ) | Joseph M. Claps and |
| Defendant-Appellant. | ) | Ursula Walowski, |
| | ) | Judges, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Justices Reyes and Martin concurred in the judgment.

ORDER

¶ 1    Held:    The circuit court's dismissal of defendant's postconviction petition at the second stage of proceedings is affirmed where defendant failed to make a substantial showing that the State committed a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose that a State witness testified in expectation of a plea bargain in her own pending criminal case.

¶ 2    This appeal arises from the circuit court's order granting the State's motion to dismiss defendant Pierre Montanez's petition for relief pursuant to the Post-Conviction Hearing Act (Act)

(725 ILCS 5/122-1 et seq. (West 2002)). On appeal, defendant contends that the circuit court erred in dismissing his postconviction petition as he made a substantial showing of a constitutional violation. Namely, defendant asserts that he made a substantial showing that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose that its "key" witness, Anais Ortiz, testified at defendant's trial with the expectation of receiving a plea bargain in her own pending case. We affirm.[1]

¶ 3        Following a jury trial, defendant and codefendant Jose Luera were found guilty of the first-degree murders of Roberto Villalobos and Alejandra Ramirez, as well as aggravated vehicular hijacking and aggravated kidnapping. Defendant was sentenced to prison terms of mandatory natural life for the two first-degree murder counts, 20 years for aggravated vehicular hijacking, and 27 years for aggravated kidnaping, the latter two sentences to run consecutive to one another and to the first-degree murder sentences. We affirmed on direct appeal. *People v. Montanez*, 2014 IL App (1st) 122369-U.

¶ 4        A comprehensive description of the trial evidence can be found in our prior disposition of defendant's direct appeal in *People v. Montanez*, 2014 IL App (1st) 122369-U. We set forth only that evidence which is necessary to review this issue.

¶ 5        At trial, Alma Ramirez, the sister of the victim Alejandra Ramirez, testified that on August 27, 2002, at about 10 p.m., she saw Villalobos pick up her sister in his vehicle and drive away.[2] Other evidence established that Ramirez's body was later found in Villalobos's burned four-door

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[2] Given the victim Alejandra Ramirez and her sister Alma Ramirez share the same last name, we will refer to the victim as Ramirez and her sister as Alma.

Chevrolet Caprice. Alma confirmed that a photograph depicted Villalobos's vehicle with burn marks, but the burn marks were not there when she observed her sister get into the vehicle that night. Alma identified defendant in court and stated defendant had visited her house two days earlier looking for Ramirez.

¶ 6 Anais Ortiz testified on April 16, 2012. Her testimony began with the following colloquy:

"[State's Attorney] Q. And you're currently in the Cook County Department of Corrections?

[Ortiz] A. Yes, sir.

Q. How long have you been housed in the Cook County Department of Corrections?

A. About 12 months.

Q. And that's because you're facing a charge of armed robbery in this courthouse?

A. Yes.

Q. And you expect to go to trial on that next month; is that correct?

A. Yes.

Q. Have you received any promises from the state's attorney's office regarding your case?

A. No."

¶ 7 Ortiz then testified that on August 27, 2002, at about 11:30 p.m. or 12 a.m., she was at Luera's house with a group of people, including defendant, whom Ortiz identified in court. Villalobos drove to the house in a Chevrolet Caprice with a "girl" in the front passenger's seat. Ortiz, defendant, Luera, and Claudia Negrette got into the back seat. Ortiz and Negrette were

dropped off one or two blocks away from the intersection of 83rd Street and Kolin Avenue, but everyone else remained in the vehicle. Ortiz later identified Luera and defendant from a photo array and identified defendant from a lineup. She identified a photograph in court as depicting a vehicle that resembled Villalobos's vehicle, but the vehicle in the photograph had burn marks that were not there when she entered the vehicle.

¶ 8    On cross-examination, the following colloquy occurred:

"[Defense Counsel] Q. *** You're currently in the Cook County Department of Corrections?

[Ortiz] A. Yes.

Q. Are you facing a charge?

A. Yes.

Q. What's the charge that you're facing?

A. Armed robbery.

Q. You've been in for a year?

A. Yes.

Q. The case is set for trial?

A. Yes.

Q. You're planning on going to trial in that armed robbery?

A. Yes."

¶ 9    John McDonnell testified that on August 28, 2002, around midnight, he was on his front porch on the 7900 block of South Kolin and saw a man "asking for help" exit through the rear driver's side window of a four-door vehicle. The man was subsequently identified as Villalobos.

A second, shirtless man, whom McDonnell subsequently identified in a photo array as Luera, exited through the same window, punched Villalobos to the ground, and continued to punch him on the ground. McDonnell approached, but saw a flash of light that he thought came from inside the vehicle. He hesitated because he thought "there could be more people inside the car." Luera stood up, Villalobos hid behind McDonnell, and Luera drew a knife. McDonnell then ran behind his house and picked up a piece of lumber. When he returned, the vehicle drove away, and Villalobos was lying on McDonnell's driveway with multiple stab wounds. McDonnell confirmed that a photograph depicted the same vehicle he saw that night. On cross-examination, McDonnell stated he could not see any other people or movements inside the vehicle but saw the light inside the vehicle.

¶ 10     Jason Samhan testified that shortly after midnight on August 28, 2002, he saw a Chevrolet Caprice drive through a red light at the intersection of 79th Street and Tripp Avenue. The vehicle had blood on the rear driver's side door, and a man's arm was choking a woman's neck with her head "out the back window." Samhan confirmed that a photograph depicted the vehicle he saw that night, but with additional burn marks he had not seen.

¶ 11     George Hoyt testified that at about 1:45 a.m. on August 28, 2002, he was working at a gas station on 67th Street and Pulaski Road. Defendant, whom Hoyt identified in court, entered with "scratches upon his face and neck area" and grabbed two one-gallon gas cans. Hoyt told defendant it would be cheaper to buy one can, fill his vehicle with gas, and drive to the gas station for more gas. Nonetheless, defendant purchased the two cans and left. Defendant returned afterwards because "he spilled some gas on himself" and asked for a paper towel, which Hoyt gave him. Later that evening, Hoyt told a police officer about defendant's purchase and gave the officer a receipt

of defendant's purchase, which was entered into evidence. Hoyt later identified defendant from a photo array and a lineup.

¶ 12    Samson Murray testified that at about 1:45 a.m. on August 28, 2002, he was outside a restaurant near the intersection of 67th and Pulaski with Nick Buogos.[3] Defendant, whom Murray identified in court and described as a friend of Buogos, approached from the nearby gas station carrying two gas cans and said, "I need to talk to you." Buogos asked Murray to wait for Buogos in the restaurant and drove away with defendant in Buogos's vehicle. Murray waited inside the restaurant for Buogos for two or three hours.

¶ 13    Chicago police officer Joseph William Dunigan, Jr. testified that shortly after midnight on August 28, 2002, he arrived at the 7900 block of South Kolin and saw Villalobos's body covered by a sheet on a driveway. He then went to the 3700 block of West 69th and saw a Chevrolet four-door vehicle with blood on the exterior driver's side and fire damage, and a "bloody" deceased woman in the rear driver's side seat. Dunigan stated there was a large quantity of water on the ground and a "strong odor of gasoline," and he learned that the Chicago Fire Department had been there.

¶ 14    The State entered stipulations that blood "card[s]" and fingernail clippings were collected from Ramirez and Villalobos, buccal swabs were collected from Luera and defendant, and biological material was removed from under Ramirez's fingernail clippings. The parties also stipulated to testimony that charred debris was collected from inside the Chevrolet Caprice, and an Illinois state police forensic chemist tested the debris and found it contained gasoline.

---

[3] While Murray testifies that he could not recall the last name of Buogos, Buogos's last name is reflected elsewhere in the trial transcript.

¶ 15 Illinois state police forensic DNA analyst Amy Rehnstrom testified that she analyzed DNA from Ramirez's right-hand fingernail clippings and could not exclude defendant, Ramirez, or Villalobos as having contributed to the DNA profile, but could exclude Luera. She also analyzed DNA from Ramirez's left-hand fingernail clippings and found that it contained a combination of two DNA profiles, and she could not exclude defendant as being one of the contributors.

¶ 16 Cook County deputy medical examiner Dr. James Filkins testified that he reviewed the autopsies of Ramirez and Villalobos. Dr. Filkins opined that Villalobos "died of multiple stab and incise wounds," and Ramirez's primary cause of death was "multiple stab wounds," with strangulation being a "significant contributing factor." He also observed that Ramirez had burn injuries that appeared to be inflicted postmortem.

¶ 17 Chicago police detective Robert Lenihan testified that on November 16, 2002, he Mirandized and interviewed defendant in the presence of defendant's attorneys. Lenihan observed what looked like a burn scar on defendant's left arm near the wrist. Defendant stated he had burned his left arm and right leg on the Fourth of July. During the interview, defendant produced for Lenihan a prescription for a cream used to treat burns, as well as a doctor's note dated "July" and signed by "Dr. E. Cabrera," both of which were entered into evidence at trial.

¶ 18 The parties stipulated that, if called to testified, Dr. Ernest Cabrera would state that he has never treated defendant "at any time for any reason" and did not sign the doctor's note. He would also identify the doctor's note as a form letter used by the medical clinic where he worked in 2002 and testify that he was the only doctor at the clinic named Cabrera in July 2002.

¶ 19 In closing, the State asserted that the evidence showed that, when defendant and Luera were in Villalobos's vehicle in front of McDonnell's house, Luera exited, chased, and killed

Villalobos, while defendant pulled Ramirez into the backseat of the vehicle and did not let her escape because she was "now a witness." The State argued Luera drove Villalobos's vehicle away from the scene, and defendant killed Ramirez. Defendant subsequently purchased gasoline from the gas station to light the vehicle on fire and "get rid of the evidence."

¶ 20    Defense counsel countered that while the evidence showed Luera killed Villalobos, there was no evidence placing defendant at the scene of either murder, and the "gaps" in the case's evidence were "huge." Counsel then asserted:

> "[O]nly one person testified that Pierre Montanez was in Roberto Villalobos' car the evening of August 27, 2002. That was Anna Ortiz. And Anna Ortiz came in here from the back door, she was wearing a jail uniform, she's fighting her own case for I think it involved a burglary to an auto or residential burglary."

¶ 21    The jury found defendant guilty of the first-degree murders of Villalobos and Ramirez, aggravated vehicular hijacking, and aggravated kidnaping. The trial court sentenced him to mandatory natural life for the two first-degree murder counts, and prison sentences of 20 years for aggravated vehicular hijacking and 27 years for aggravated kidnaping, to run consecutive to one another and to the first-degree murder sentences.

¶ 22    On direct appeal, defendant argued that the State engaged in prosecutorial misconduct in closing argument by misstating the trial evidence. *Montanez*, 2014 IL App (1st) 122369-U, ¶ 19. We affirmed. *Id.* ¶ 25.

¶ 23    In December 2014, defendant filed a *pro se* postconviction petition setting forth 18 claims, including multiple allegations of ineffective assistance of counsel and a claim that the circuit court judge denied him a fair trial. On February 2, 2015, defendant filed a *pro se* "[s]upplemental"

postconviction petition, adding a claim that the State violated *Brady* when it failed to disclose to the defense that it entered into a plea deal with Ortiz, under which the State would be lenient in Ortiz's pending armed robbery case in exchange for Ortiz's testimony against defendant. Defendant attached a supporting affidavit in which he reiterated the allegations underlying this claim.

¶ 24    On March 13, 2015, defendant's petition was docketed for second-stage postconviction proceedings. Defendant was appointed counsel. During a hearing on March 16, 2016, defendant informed the circuit court that he wanted to proceed *pro se*, and the court permitted defendant's postconviction counsel to withdraw.

¶ 25    In April 2016, defendant filed his *pro se* "first amended" postconviction petition, which "adopt[ed] all filings in the instant proceeding" and alleged over 30 claims, including his prior *Brady* claim. Defendant stated Ortiz testified that she was in jail awaiting trial within a month for an armed robbery charge, and that the State did not promise her anything for her testimony. He asserted Ortiz never went to trial and instead entered into a plea deal under which she pleaded guilty to theft and received a sentence of 14 months. According to defendant, the State used Ortiz's testimony at his trial to "place [him] in the car" where the offenses occurred. Defendant alleged that evidence of the undisclosed plea deal would have been favorable to him and undermines confidence in the outcome of his trial, as it shows Ortiz had "a motive to testify falsely."[4] He attached a supporting affidavit restating the allegations in his amended petition.

---

[4] In a separate claim, defendant alleged that the State improperly allowed Ortiz to commit perjury when she testified falsely that she received no promises in exchange for her testimony. He further alleged his trial counsel was ineffective for failing to investigate and "bring to light" that, contrary to Ortiz's testimony, she had testified pursuant to a plea agreement. He raises neither argument on appeal.

¶ 26    Defendant filed a motion for discovery, requesting the State's files for Ortiz's armed robbery case, to determine whether Ortiz received a plea deal. He attached a letter from the State Attorney's office responding to a FOIA request for information regarding the disposition of the criminal charge against Ortiz, stating that Ortiz pleaded guilty to theft in case number 11 CR 7011 and was sentenced to 14 months.

¶ 27    The circuit court found that any evidence of a plea deal would be relevant and stated it would examine the State's file on Ortiz's case number 11 CR 7011 and give defendant any information to which defendant was entitled. At a hearing on June 1, 2016, the circuit court read into the record two notes tendered to it from the State's trial file on Ortiz. The court told defendant these two notes were "the only thing [the court] found *** that would be in any way discoverable to [defendant]." It ordered that defendant be provided with copies of the notes, and with a copy of Ortiz's indictment in case number 11 CR 7011.

¶ 28    In June 2016, defendant filed a *pro se* "motion to vacate judgment," alleging that the State had suppressed evidence regarding Ortiz's plea deal. Attached to the motion was another FOIA response from the State's Attorney's office, informing defendant that "Ortiz pled guilty to theft on May 17, 2012." Also attached were Ortiz's indictment in case number 11 CR 7011, charging her with one count of armed robbery and six counts of aggravated battery, and the two notes from Ortiz's case file. One of the notes states as follows:

> "Call V, offer [right pointing arrow symbol] how do they feel about probation or
> robbery?

D call [the assistant state's attorney in defendant's case] – atty says D is a witness

in his murder and was reluctant to testify? D [Martinez or Montanez]?"[5]

The other note states:

"V's interviewed regarding a plea to theft for probation. V did not want to testify

and is happy with that result—all witnesses concur and also did not want to testify per

ASA.

5.11.12 Gaughan [triangle symbol] i/c @ w/attny

Amend ct 1 to theft from person

PG/JLD/PG – 14 mos prob

ARG

nolle pros remaining cts."

The circuit court ultimately determined it would consider the motion and its contents as

incorporated into defendant's amended postconviction petition.

¶ 29    On February 7, 2017, the State filed its motion to dismiss defendant's postconviction

petition, alleging in relevant part that defendant's allegation of a *Brady* violation was unfounded.

The State asserted that defendant failed to provide any evidence supporting his assertion that "Ortiz

was given a deal in exchange for her testimony," or that the State suppressed evidence of the deal,

particularly in light of Ortiz's testimony "that she was in custody with an active case for armed

robbery." The State also argued defendant's broad conclusory statements were insufficient to show

the alleged suppressed evidence was material.

---

[5] The word at the end of the first note is partially illegible. Defendant interprets the word to be "Montanez," while the State interprets it to be "Martinez."

¶ 30    On February 24, 2017, defendant filed a motion to "strike" the State's motion to dismiss, "or in the alternative, require the People to provide a more definite statement." Defendant argued that the State had filed a "hybrid motion" that challenged both the legal sufficiency and factual merits of his petition. The circuit court denied the motion.

¶ 31    At the hearing on the State's motion to dismiss, defendant argued, *inter alia*, that his petition established that the State had introduced false testimony from Ortiz regarding her pending charges and having received no promises for her testimony. He also asserted that, had he received Ortiz's indictment and evidence of Ortiz' plea deal, he "would have gotten on the witness stand [him]self," but the State's failure to disclose information about the plea agreement "denied [him] a defense." The State responded that while the documents attached to defendant's petition showed that victims were interviewed regarding a plea of theft in Ortiz's case, they did not indicate that Ortiz had received any promises when she testified in defendant's case that she still expected to go to trial on her armed robbery charge.

¶ 32    On August 29, 2017, the court granted the State's motion to dismiss "[f]or reasons set forth in the State's motion."

¶ 33    Following the dismissal of defendant's first amended postconviction petition, defendant subsequently filed, in chronological order, a motion to amend his postconviction petition a second time, a "supplemental" motion to amend the petition, a timely motion to reconsider the dismissal of his petition, an "addendum" to his proposed second amended postconviction petition, and a "supplemental" motion for reconsideration of the dismissal, among many other filings. The circuit court denied defendant's requests to amend his postconviction petition and told defendant his only

option for bringing additional claims was to move for leave to bring a successive postconviction petition.

¶ 34     On November 29, 2018, the circuit court denied defendant's motions for reconsideration.[6] This court granted defendant leave to file a late notice of appeal.

¶ 35     On appeal, defendant asserts that the circuit court erred in dismissing his postconviction petition, as he made a substantial showing that the State violated *Brady* by failing to disclose that Ortiz had entered into a plea agreement prior to testifying against defendant at trial. Defendant asserts that, as a result, "the jury remained totally unaware that Ortiz was testifying with the expectation of a personal benefit." He argues this concealed evidence is material under *Brady* because the fact that Ortiz expected a plea would have provided the defense with compelling evidence to impeach Ortiz's important testimony. The State responds that the record shows Ortiz did not accept a plea bargain until after giving her testimony, and that Ortiz's acceptance of a plea bargain was not material to the finding of defendant's guilt.

¶ 36     The Act provides a three-stage method for persons under criminal sentence to "assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both." *People v. Hodges*, 234 Ill. 2d 1, 9-10 (2009). Defendant's petition was dismissed at the second stage of proceedings, in which counsel is appointed to represent the defendant if necessary, and the State is permitted to file responsive

---

[6] On the same date, the circuit court denied defendant's second amended petition for relief from judgment under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2018)). We affirmed the denial on appeal, granting appointed counsel leave to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987). *People v. Montanez*, No. 1-19-0017 (2020) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

In August 2019, the circuit court denied defendant leave to file a successive postconviction petition. His appeal challenging that judgment is currently pending in appeal No. 1-19-1930.

pleadings. *People v. Edwards*, 197 Ill. 2d 239, 245-46 (2001). At the second stage of postconviction proceedings, "the circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." *Id.* at 246. "[A]ll well-pleaded facts that are not positively rebutted by the trial record are to be taken as true." *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). The second stage of postconviction review "tests the legal sufficiency of the petition" (*People v. Domagala*, 2013 IL 113688, ¶ 35), as well as the petition's factual sufficiency (*People v. Alberts*, 383 Ill. App. 3d 374, 377 (2008) (citing *People v. Morris*, 43 Ill. 2d 124, 128 (1969)).

¶ 37    "The inquiry into whether a post-conviction petition contains sufficient allegations of constitutional deprivations does not require the circuit court to engage in any fact-finding or credibility determinations," as such determinations are made during the evidentiary third stage of postconviction proceedings. *People v. Coleman*, 183 Ill. 2d 366, 385 (1998). "An evidentiary hearing is only required when the allegations of the petition, supported by the trial record and accompanying affidavits, make a substantial showing of a violation of a constitutional right." *People v. Flowers*, 2015 IL App (1st) 113259, ¶ 31. In reviewing the second-stage dismissal of a postconviction petition, this court reviews *de novo* the circuit court's decision. *Pendleton*, 223 Ill. 2d at 473.

¶ 38    In *Brady*, the United States Supreme Court held that "the prosecution must disclose evidence that is favorable to the accused and 'material either to guilt or to punishment.' " *People v. Harris*, 206 Ill. 2d 293, 311 (2002) (quoting *Brady*, 373 U.S. at 87). To succeed on a *Brady* claim, a defendant must show that "(1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either

willfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment." *People v. Beaman*, 229 Ill. 2d 56, 73-74 (2008).

¶ 39    "When the reliability of a given witness may well be determinative of guilt or innocence, the nondisclosure of evidence affecting credibility falls within the general *Brady* rule." *People v. Walls*, 323 Ill. App. 3d 436, 444 (2001) (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)). "A defendant may impeach a State's witness with evidence of that witness's 'biases, interests, or motives to testify,' " including "evidence that 'any promises of leniency have been made or any expectations of special favor exist in the mind of the witness.' " *People v. Morales*, 2019 IL App (1st) 160225, ¶ 32 (applying *Brady* to evidence that a State witness received assistance with immigration matters) (quoting *People v. Triplett*, 108 Ill. 2d 463, 474, 476 (1985)).

¶ 40    As an initial matter, the record rebuts defendant's claim that Ortiz testified in his case under a plea agreement and/or in anticipation of leniency in her own case, where Ortiz testified, she had not received any promises at the time of her testimony, and that she expected to go to trial for her own case in the next month. Necessarily, since Ortiz did plead guilty to theft approximately a month after testifying, a plea offer was made to her at some point. But even construing the supporting evidence attached to defendant's postconviction petition liberally as we must (*People v. Sanders*, 2016 IL 118123, ¶ 31), it does not show that, as defendant claims and contrary to Ortiz's testimony, she did receive a promise of any kind regarding her own case prior to testifying.

¶ 41    At most, Ortiz's seven-count indictment, the two notes from Ortiz's case file, and the letter responding to a FOIA request show that on May 17, 2012, more than a month after Ortiz testified, her armed robbery charge was reduced to theft, she pled guilty to theft and was sentenced to 14 months, and the State nol-prossed the six aggravated battery counts. But dismissing or reducing

charges after a witness has testified does not necessarily mean the witness and the State had a pre-testimony agreement, and defendant's submissions do not show there was, in fact, a pre-testimony agreement. The two notes from the case file are undated, and thus do not reflect that any communications regarding a plea or offer were made to Ortiz before she testified, or that she was promised anything by the State *prior to* defendant's trial, which is the crux of defendant's *Brady* claim.

¶ 42    Further, the notes show communications regarding an "offer" or "plea to theft" were made to "V," and not to Ortiz; the parties agree "V" in both notes refers to the victim(s) in Ortiz's case. In a similar vein, the fact that someone made an undated note to call the assistant state's attorney in defendant's case, noting Ortiz's apparent reluctance to testify therein, also does not show a plea agreement, offer, or promise was made to or discussed with Ortiz prior to defendant's trial. Defendant's interpretation of the documents as showing otherwise is entirely speculative, and they do not rebut Ortiz's testimony that, when she testified at defendant's trial, she was made no promises by the State.

¶ 43    In addition, whether Ortiz made or discussed a plea agreement with the State prior to defendant's trial, or she testified in anticipation of leniency in her own case, was not material to the outcome of defendant's trial.

¶ 44    The standard for materiality resembles the prejudice standard applied in ineffective assistance of counsel cases. *Morales*, 2019 IL App (1st) 160225, ¶ 36. The "touchstone of materiality" is "a reasonable probability of a different result," which is shown "when the government's evidentiary suppression undermines confidence in the outcome of the trial." (Internal quotation marks omitted.) *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). In determining

materiality, the standard is not a "sufficiency of evidence test," nor is it "whether the defendant would more likely than not have received a different verdict with the evidence" that was suppressed. *Id.* Rather, the court must determine whether, in the absence of the suppressed evidence, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* "[E]vidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict." *Smith v. Cain*, 565 U.S. 73, 76 (2012).

¶ 45    In his postconviction petition, defendant asserted that evidence of Ortiz's pretrial plea agreement was material, as Ortiz was the only witness who testified defendant was in Villalobos's vehicle with Luera on the night of the offense, and "no other evidence" placed defendant in the vehicle during the relevant time. He argues on appeal that, had the preexisting agreement been disclosed, defense counsel would have used it to impeach Ortiz, demonstrating Ortiz had a considerable inducement to testify in support of the State's case. Ortiz's credibility would have been compromised and, as she was the State's "key witness" in defendant's case, the suppression of an agreement or general offer of favorable treatment in exchange for her testimony was material as it undermined confidence in the outcome of the trial. We disagree.

¶ 46    There is no question the existence of a pretrial plea deal or offer between the State and Ortiz could have impacted Ortiz's credibility had she been impeached with this information at trial. But the materiality of the information is undercut by the fact that defense counsel already challenged Ortiz's credibility at trial, telling the jury in closing argument, "only one person testified that [defendant] was in *** Villalobos's car the evening of August 27, 2002. That was Anna Ortiz. And Anna Ortiz came in here from the back door, she was wearing a jail uniform,

she's fighting her own case for I think it involved a burglary or an auto or residential burglary." Even had counsel impeached Ortiz further with evidence that she was testifying under an agreement with the State, this does not mean the jury would have entirely discredited her testimony that, when she and Negrette got out of Villalobos's vehicle, defendant stayed in the vehicle with Luera, Villalobos, and the "girl" in the front seat.

¶ 47 Further, the State did not solely rely on Ortiz's testimony in establishing defendant's guilt. Even had evidence that Ortiz testified pursuant to a plea agreement been disclosed at trial, the other evidence at trial was "strong enough to sustain confidence in defendant's verdict." *Id.* Alma testified defendant knew her sister, Ramirez, and he had come to the sisters' house looking for Ramirez. On August 27, 2002, around 10 p.m., Alma saw Villalobos pick up Ramirez and drive away in Villalobos's vehicle. Ortiz testified she entered Villalobos's Chevrolet Caprice with Negrette, Luera, and defendant sometime between 11:30 and midnight that night. She saw a "girl" already in the front passenger seat. Ortiz later exited the vehicle with Negrette, while defendant, Luera, Villalobos, and the girl remained in the vehicle.

¶ 48 Around midnight, McDonnell saw a man, whom he subsequently identified as Luera, exit Villalobos's Chevrolet Caprice and beat another man, subsequently identified by police as Villalobos. McDonnell saw a flash of light inside the vehicle, leading him to think there might be more people inside the vehicle. McDonnell subsequently found Villalobos covered in stab wounds. Shortly after midnight, Samhan saw Villalobos's Chevrolet Caprice drive through a red light with blood on the driver's side rear door and a woman being choked with her head hanging out of the rear window. Consistent with this evidence, when Ramirez's body was recovered from the burned

four-door Caprice later that night, an autopsy revealed that she had multiple stab wounds and strangulation marks.

¶ 49    Alma, McDonnell, and Samhan all identified a photograph of the burned Chevrolet Caprice as the Chevrolet they saw that night, albeit the vehicle did not have burn marks when they saw it. The discovery of Ramirez's body in Villalobos's Chevrolet Caprice also corroborated Alma's testimony that Ramirez was in Villalobos's vehicle and Ortiz's testimony that a "girl" remained in the vehicle when Ortiz got out. McDonnell's testimony corroborated Ortiz's testimony that Luera and Villalobos were together in Villalobos's vehicle. Even if the jury heard Ortiz impeached with evidence that she was testifying pursuant to a plea or leniency agreement, the other evidence presented at trial corroborated much of her testimony.

¶ 50    Further, abundant evidence supported a finding that defendant had purchased two cans of gasoline in order to burn the Caprice with Ramirez inside it. When an officer found the Caprice containing Ramirez's body, the vehicle had fire damage and a strong odor of gasoline, and debris from inside the vehicle was found to contain gasoline. Ramirez's autopsy report revealed that she had burn marks that appeared to be inflicted posthumously. At 1:45 a.m., Murray saw defendant walk up to a restaurant with two gas cans from a nearby gas station and ask to speak with a friend, and the friend then drove off with defendant. A gas station employee testified he sold defendant two cans of gasoline at around 1:45 a.m. and observed scratches on defendant's face and neck. DNA testing showed defendant could not be excluded as having contributed to the DNA profile under the fingernail clippings recovered from Ramirez, supporting a reasonable inference that Ramirez was the one who caused defendant's scratch marks.

¶ 51    Moreover, when a detective spoke with defendant about the burn scar on defendant's arm, defendant told the detective he had received the burn on the Fourth of July and produced a doctor's note reflecting treatment for a burn in July. However, the parties stipulated that the doctor whose name was on the note had not actually signed the note and had never treated defendant, supporting a finding that the doctor's note was forged to explain the burn scar defendant received from attempting to burn Villalobos's vehicle.

¶ 52    The State presented ample evidence that defendant was, at a minimum, accountable for the murders of Villalobos and Ramirez while in Villalobos's vehicle with Luera where he was seen in the vehicle with the victims, he had scratches on his neck, his DNA was found under Ramirez's fingernails, Villalobos's vehicle was burned with Ramirez's body inside it, defendant purchased two cans of gasoline not long after Luera had killed Villalobos and Samhan saw the vehicle drive by with a woman being strangled out the window, and defendant lied about where he sustained the burn on his arm.

¶ 53    In light of this evidence, we cannot find that evidence of a plea agreement as to one of the many witnesses in this case would have undermined confidence in the jury's finding of defendant's guilt, even had such an agreement existed at the time of Ortiz's testimony. Even if Ortiz had been impeached with evidence regarding a plea agreement or leniency, we find that defendant nonetheless received a fair trial, and the outcome was worthy of confidence. As such, the impeachment evidence was not material to his guilt or innocence. Defendant failed to make a substantial showing of a *Brady* violation, and the circuit court properly dismissed defendant's petition. *Strickler v. Greene*, 527 U.S. 263, 281 (1999) ("[S]trictly speaking, there is never a real

'*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.").

¶ 54    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 55    Affirmed.