2025 IL App (1st) 232292-U

No. 1-23-2292

Order filed December 10, 2025

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 02 CR 31134 |
| | ) | |
| PIERRE MONTANEZ, | ) | Honorable |
| | ) | Pamela J. Stratigakis, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court.
Justices Rochford and Reyes concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm the circuit court's denial of defendant's *pro se* motion for forensic testing when defendant failed to establish that (1) the requested DNA testing of previously tested fingernail clippings was not scientifically available at the time of trial and (2) the testing of Caucasian head hairs found with the victim's body could produce new, noncumulative evidence materially relevant to a claim of actual innocence.

¶ 2   Defendant Pierre Montanez (also referred to as Piere Martinez and Piere Montanez)

appeals from the circuit court's denial of his *pro se* motion for DNA testing filed pursuant to

section 116-3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/116-3 (West 2020)).

On appeal, defendant contends that the court erred when (1) material from the victim's fingernail clippings was not "tested fully," (2) Caucasian head hairs found near the victim's body were not previously tested, and (3) the results of this testing would materially advance an actual innocence claim. We affirm.[1]

¶ 3    Following a jury trial, defendant was found guilty, under an accountability theory, of the first degree murders of Roberto Villalobos and Alejandra Ramirez, aggravated vehicular hijacking, and aggravated kidnapping. He was sentenced to life in prison for the first degree murders, consecutive to prison terms of 20 years and 27 years for aggravated vehicular hijacking and aggravated kidnapping, respectively. We have detailed the evidence in our prior orders disposing of defendant's appeals. See, *e.g.*, *People v. Montanez*, 2014 IL App (1st) 122369-U. We will only present the facts necessary to resolve this appeal.

¶ 4    The evidence at trial established that at 11:30 p.m. on August 27, 2002, Villalobos and Ramirez arrived at a location in a Chevy Caprice and picked up defendant, co-offender Jose Luera, and two young women. After dropping off the young women, Villalobos drove away with Ramirez in the front passenger seat and defendant and Luera in the back seat. At that time, certain burn marks were not on the vehicle.

¶ 5    John McDonnell testified that around midnight on August 28, 2002, he was outside his home when Villalobos exited the Caprice through the back driver's side window and asked for help. Luera, who was shirtless, exited the same window and beat Villalobos. When the men separated, Villalobos hid behind McDonnell and again asked for help. As McDonnell and

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

Villalobos backed up the driveway, Luera followed. When McDonnell told Luera to leave, Luera drew a knife. McDonnell ran to grab a two-by-four. When he returned, the vehicle was "taking off" with the right passenger door open. Villalobos was on the ground with multiple stab wounds.

¶ 6 Jason Samhan testified that shortly after midnight on August 28, 2002, as he approached the intersection of 79th Street and Tripp Avenue, a Chevrolet Caprice ran a red light and almost hit his vehicle. Samhan saw blood on the driver's side rear door and a woman with her head "out the window." A man's arm choked the woman's neck and she was screaming and trying to "fight back."

¶ 7 George Hoyt testified that on August 28, 2002, he was working at a gas station at 67th Street and Pulaski Road in Chicago. At 1:45 a.m., defendant entered and picked up two one-gallon cans. Defendant stated that his van had run out of gas and was located two to three blocks away. Hoyt told defendant it would be cheaper to buy one can of gas, put that in the vehicle, and then return to fill the tank. Defendant bought two cans of gas and left. Hoyt noticed scratches on defendant's face and neck.

¶ 8 Retired Chicago police forensic investigator Joseph William Dunigan Jr. testified that, on August 28, 2002, he arrived at the 3700 block of West 69th Street, observed a Chevy with fire damage, and smelled gasoline. There was blood on the exterior and interior of the vehicle. Ramirez's corpse was in the back seat. Dunigan processed the crime scene.

¶ 9 The State entered stipulations that blood "card[s]" and fingernail clippings were collected from Ramirez and Villalobos and that buccal swabs were collected from Luera and defendant. Biological material was removed from under Ramirez's fingernail clippings and blood was indicated on the clippings from both hands.

¶ 10    Illinois State Police forensic DNA analyst Amy Rehnstrom testified that she received known DNA samples from Ramirez, Villalobos, defendant, and Luera. Rehnstrom then obtained DNA profiles from the evidence recovered from the crime scene. Next, she compared the DNA profiles in the crime scene evidence to the DNA samples from each person.

¶ 11    Rehnstrom performed short tandem repeat (STR) DNA analysis, which examined 13 different areas of the DNA. None of the swabs from the interior of the car originated from defendant.

¶ 12    Regarding the right hand fingernail clippings, Rehnstrom identified a mixture of DNA. At least three people contributed to this mixture. She could not exclude Ramirez, Villalobos, and defendant as contributing to the mixture, but could exclude Luera. There were "DNA types that are present" but Rehnstrom could not "say that they match the people." Rather, "the DNA type present could be consistent with them" and she could not "exclude them from the DNA profile."

¶ 13    Regarding the left hand fingernail clippings, Rehnstrom identified a mixture of DNA profiles that she "interpreted" as a mixture of two people. Assuming that one of the profiles belonged to Ramirez, then defendant could not be excluded as being the second contributor. DNA types were present that "could be consistent" with defendant's "DNA types," and Rehnstrom could not exclude him.

¶ 14    Rehnstrom performed a statistical analysis on the left hand fingernail clippings. Assuming that the profile was a mixture of Ramirez and one other person, "approximately one in 10 quadrillion black, one in 18 quadrillion white, or 1 in 2.5 quadrillion Hispanic unrelated individuals cannot be excluded as the other contributor." According to Rehnstrom, "you would have to add

approximately six more zeros to the population of the earth to find one other person who can't be excluded from the DNA profile other than the defendant."

¶ 15    During cross-examination, Rehnstrom acknowledged that she could not say that the DNA "match[ed]" defendant; rather, "[a]ll" she "can do is say that there are DNA types present where he can't be excluded." The "assumptions" Rehnstrom made were based on her experience; that is, when she analyzed fingernail swabbings, she "usually pick[ed] up" the DNA profile of the person to whom the fingernails belonged. Here, she assumed that Ramirez's DNA profile was present in the fingernail clippings. Rehnstrom asserted that, even without assuming that Ramirez's DNA profile was present, Rehnstrom "still" would have concluded that defendant could not be excluded. However, Rehnstrom could not have prepared a statistical calculation. She did not run a statistical calculation with the assumption that Ramirez's DNA was not present. During redirect, Rehnstrom testified that it was a generally accepted practice in DNA analysis to make such an assumption. (Based on the context, we assume that Rehnstrom meant that it was a generally accepted practice to assume that the DNA of the person to whom the fingernail belonged was present.)

¶ 16    Retired Chicago police detective Robert Lenihan testified that on November 16, 2002, defendant came to a police station accompanied by two attorneys. During a subsequent conversation, defendant stated that he had never seen Ramirez. Although defendant knew Villalobos and had been in a vehicle with Luera and Villalobos during the day, he denied being in Villalobos's vehicle at night. At one point, Lenihan observed a burn scar on defendant's left arm near the wrist. Defendant stated that he burned his left arm and right leg on the Fourth of July, and one of his attorneys tendered a note, signed by a "Dr. E. Cabrera," stating that defendant was

treated for burns. Defendant also stated that he bought two cans of gasoline in the morning of August 28, 2002, because he ran out of gas.

¶ 17    The parties stipulated that, if called to testify, Dr. Ernest Cabrera would state that he never treated defendant "at any time for any reason."

¶ 18    Additional testimony established that Ramirez's primary cause of death was multiple stab wounds, with strangulation as a "significant contributing factor."

¶ 19    The jury found defendant guilty of aggravated vehicular hijacking, aggravated kidnapping, and two counts of first degree murder. The trial court imposed life in prison for the first degree murders and consecutive prison terms of 20 years for aggravated vehicular hijacking and 27 years for aggravated kidnapping. We affirmed on direct appeal. See *Montanez*, 2014 IL App (1st) 122369-U.

¶ 20    Defendant thereafter filed multiple unsuccessful collateral attacks on his convictions. *People v. Montanez*, No. 1-19-0017 (2020) (unpublished order under Supreme Court Rule 23(c)); *People v. Montanez*, 2021 IL App (1st) 191065-U; *People v Montanez*, 2022 IL App (1st) 191930, *aff'd*, 2023 IL 128740; *People v. Montanez*, Nos. 1-23-2293 (2024), 1-23-2294 (2024) (unpublished summary orders under Supreme Court Rule 23(c)).

¶ 21    On August 12, 2020, defendant filed a *pro se* motion for DNA testing alleging that he was innocent and that "inconclusive" DNA evidence "could not establish [him] as the assailant." The motion alleged that Rehnstrom's failure to test the "other unknown contributor" found under Ramirez's fingernails rendered her testimony "potentially" false and that certain Caucasian hairs were never "examined." The motion further alleged that, according to Chicago police dispatch calls, at 12:36 a.m., a white man with a 10-inch knife was observed in possession of a Chevy

Caprice. The motion requested that the fingernail clippings and the Caucasian hairs be subjected to DNA testing.

¶ 22    Attached were, relevant here, October 21, 2002, and November 14, 2002, letters from Illinois State Police forensic scientists; a July 1, 2003 letter from Rehnstrom; and an August 28, 2002 "Chicago Police Department Event Inquiry" (Event Inquiry).

¶ 23    The October 31, 2022, letter from forensic scientist Les Kordylewski identified Ramirez as the victim and listed evidence received by the Forensic Science Center including "Victim's head hair samples" (Exhibit 1); "Head h*ir c**bing" (Exhibit 1A) (there is fading on the scan included in the record); "Head hair standard" (Exhibit 1B); "Pubic hair standard" (Exhibit 2B); victim's right hand fingernail clippings (Exhibit 3A); and victim's left hand fingernail clippings (Exhibit 3B). The letter further stated that "Caucasian head hairs, fibers, hairs unsuitable for comparison, and miscellaneous debris were observed in Exhibit 1A"; Exhibit 1B consisted of Caucasian head hairs; Exhibit 2B consisted of Caucasian pubic hairs; and that Exhibits 1B and 2B were suitable for comparison.

¶ 24    The November 14, 2002, letter from forensic scientist Marla Fiorelli stated, relevant here, that Exhibits 1B and 2B were not examined.

¶ 25    The July 1, 2003, letter from Rehnstrom stated that a swab of the right hand fingernail clippings had a mixture of human DNA profiles from at least three people; that Ramirez, Villalobos, and defendant could not be excluded as having contributed to the mixture of DNA profiles identified; and that approximately 89% of black, 99% of white, or 93% of Hispanic unrelated individuals cannot be excluded as having contributed to the mixed DNA profile. The

letter further stated that a swab from the left hand fingernail clippings had a mixture of DNA profiles that was interpreted as a mixture from two people, and that:

> "Assuming the mixture of human DNA *** is a mixture of Alejandra Ramirez and one other individual, a human DNA profile was identified from which [defendant] cannot be excluded. Assuming this profile is a mixture of Alejandra Ramirez and on [*sic*] other individual, approximately 1 in 10 quadrillion Black, 1 in 18 quadrillion White or 1 in 2.5 quadrillion Hispanic unrelated individuals cannot be excluded as the other contributor."

¶ 26    The letter concluded, relevant here, that defendant could not be excluded from having contributed to the DNA profiles identified in the fingernail clippings.

¶ 27    The Event Inquiry stated, in pertinent part, that "m/wh 5'5 130 no shirt[,] long pants w/10'' buck knife 1/s nb on kolin…poss in a gry chev caprice[,] no info as to whether gang affiliated."

¶ 28    On June 23, 2021, the State filed a motion to dismiss defendant's section 116-3 motion.

¶ 29    On August 5, 2021, defendant filed an amended section 116-3 motion. In addition to alleging that the DNA evidence was "inconclusive," the amended motion alleged that the State did not disclose that Rehnstrom had admitted to submitting falsified timesheets. The motion further asserted that Rehnstrom "racially profiled" defendant, whom she assumed was Hispanic, by manipulating her "results" to show a Hispanic person's DNA under the left hand fingernail clippings. Defendant, who asserted that he was "Black," posited that Rehnstrom's conclusions were not "worthy of confidence." The motion further asserted that the State did not disclose that the hairs recovered with Ramirez's body were suitable for comparison but were never tested.

¶ 30    On March 14, 2022, the trial court appointed counsel. On July 26, 2023, appointed counsel adopted the amended section 116-3 motion as a response to the State's motion to dismiss.

¶ 31    At the hearing on the motion to dismiss, the State asserted that no allegations against Rehnstrom related to her "work product." The State argued that the fingernail clippings were tested pretrial and that no further testing would outweigh the results of that testing, which indicated that defendant could not be excluded as contributing to the samples. Additionally, testing of the hairs would be immaterial to defendant's claim of actual innocence.

¶ 32    Appointed counsel asserted that Rehnstrom was "inherently dishonest," defendant maintained his innocence, and no witnesses placed him at the crime scenes. Testing of the hairs, however, could potentially place "another" person at the crime scenes. While the right hand fingernail clipping were previously tested, there was an "unknown mixture" that was not tested and further testing could support defendant's claim of actual innocence. Counsel also clarified that defendant sought to test the "hair" rather than the pubic hair combings.

¶ 33    In response, the State acknowledged that the right hand fingernail clippings were tested, that "approximately 89 percent of black, 99 percent of white, or 93 percent of Hispanic unrelated individuals cannot be excluded as having contributed to this mixed DNA profile at the D5S818 locus," and that the result was given for one locus. The State further acknowledged that "right now," DNA analysis tests "up to 23 loci."

¶ 34    On November 9, 2023, the trial court granted the State's motion to dismiss.

¶ 35    On appeal, defendant contends that the circuit court erred in denying his motion for DNA testing when the fingernail clippings were not "fully tested," the Caucasian head hairs were not tested, and the results of testing would advance his actual innocence claim.

¶ 36    Section 116-3 of the Code, relevant here, permits a defendant to move for forensic DNA testing "on evidence that was secured in relation to the trial *** which resulted in his or her

conviction," and (1) "was not subject to the testing which is now requested at the time of trial" or (2) "although previously subjected to testing, can be subjected to additional testing utilizing a method that was not scientifically available at the time of trial that provides a reasonable likelihood of more probative results." 725 ILCS 5/116-3(a)(1), (a)(2) (West 2020). To obtain forensic testing, the defendant must first present a *prima facie* case showing that (1) identity was an issue at trial and (2) a proper chain of custody exists and is sufficient to establish that the evidence to be tested "has not been substituted, tampered with, replaced, or altered in any material aspect." 725 ILCS 116-3(b)(1), (b)(2) (West 2020).

¶ 37     "[A] defendant makes a sufficient showing that identity was at issue when he denied at trial that he committed the crime." *People v. Cocroft*, 2020 IL App (1st) 180056, ¶ 21. As to the chain of custody, "a defendant may rely on conclusions and presumptions in his or her petition because the evidence sought to be tested will almost surely have been within the State's safekeeping rather than the defendant's." *Id*.

¶ 38     Once a *prima facie* case is established, the court must then determine if (1) "the result of the testing has the scientific potential to produce new, noncumulative evidence *** materially relevant to the defendant's assertion of actual innocence" even where the results would not completely exonerate the defendant, and (2) "the testing requested employs a scientific method generally accepted within the relevant scientific community." 725 ILCS 5/116-3(c)(1), (c)(2) (West 2020).

¶ 39     "[E]vidence which is 'materially relevant' to a defendant's claim of actual innocence is simply evidence which tends to significantly advance that claim." *People v. Savory*, 197 Ill. 2d 203, 213 (2001). Whether forensic evidence "significantly advances" the defendant's claim of

actual innocence requires an evaluation of the evidence at trial, as well as the evidence that the defendant seeks to test. *People v. Stoecker*, 2014 IL 115756, ¶ 33.

¶ 40     We review *de novo* the circuit court's ruling on a motion for forensic DNA testing pursuant to section 116-3 of the Code. *Id.* ¶ 21. The well-pleaded facts in a section 116-3 motion are accepted as true and construed liberally unless contradicted by the record. *Cocroft*, 2020 IL App (1st) 180056, ¶ 21.

¶ 41     Here, defendant seeks DNA testing of (1) the fingernail clippings, which were tested prior to trial, and (2) the untested Caucasian head hairs found with Ramirez's body.

¶ 42     Regarding the fingernail clippings, the State concedes that identity was an issue at trial and that the evidence was subject to a secure chain of custody. See 725 ILCS 116-3(b)(1), (b)(2) (West 2020). However, the State notes that the fingernail clippings were previously subjected to DNA testing and maintains that defendant has not shown that the DNA testing he seeks is "a method that was not scientifically available at the time of trial." See 725 ILCS 5/116-3(a)(2) (West 2020).

¶ 43     As our supreme court explained, "defendants seeking additional testing of evidence which has already been subjected to testing have a greater burden to establish their case than those defendants whose evidence has not been tested." *Stoecker*, 2014 IL 115756, ¶ 26. Pursuant to section 116-3(a)(2) of the Code, a "defendant must show that the additional testing is likely to produce more probative results than the previous tests," which involves "comparing the respective probative values of the two tests." *Id.* (citing 725 ILCS 5/116-3(a)(2) (West 2008)).

¶ 44     Initially, defendant argues that the left hand fingernail scrapings do not fall under section 116-3(a)(2) of the Code because Rehnstrom assumed that one profile in the sample belonged to Ramirez. Thus, according to defendant, the left hand fingernail clippings were not "fully" tested.

Defendant concludes that the failure to test "one source" in the sample effectively renders the sample untested. However, he relies on no authority for the proposition that a partial testing of a sample is equivalent to no testing at all or that using such an assumption when testing a sample is fatal to the test itself. See *id.* ¶ 35 (denying retesting of evidence when the defendant failed to identify an inaccuracy in the original testing).

¶ 45     Moreover, as to the fingernail clippings, defendant did not assert in his pleadings that DNA testing was "not scientifically available" at the time of trial. See 725 ILCS 5/116-3(a)(2) (West 2020). Rather, defendant contended that the earlier tests were inconclusive, and that retesting would result in more precise results. However, whether advancements in the DNA tests themselves permit more precise DNA analysis is not the standard. See *id.*

¶ 46     Here, the record reveals that Rehnstrom performed STR DNA analysis, which examined 13 different areas of DNA, and that she tested the right and left hand fingernail clippings. Regarding the right hand, she could not exclude defendant from the DNA mixture of at least three people. As to the left hand fingernail clippings, Rehnstrom identified a mixture of DNA profiles that she "interpreted" as a mixture of two people, and assuming that one of the profiles belonged to Ramirez, then defendant could not be excluded as being the second contributor. Rehnstrom further testified that, even without assuming that one of the DNA profiles belonged to Ramirez, she "still" would have concluded that defendant could not be excluded. She also acknowledged that she could not say that the DNA "match[ed]" defendant, only that "there are DNA types present where he can't be excluded."

¶ 47     Accordingly, defendant has failed to meet his burden under section 116-3(a)(2) of the Code to establish that the requested testing was not scientifically available at the time of trial. Moreover,

defendant has not identified a new form of DNA testing; rather, his arguments focus on the alleged lack of "probative" value of Rehnstrom's results and the fact that "advancements" in DNA testing technology would provide "more precise testing" than was available at the time of the original testing. However, a defendant's burden under section 116-3(a)(2) to show that requested testing was not available at the time of trial or when earlier testing occurred "is not whether the lab that tested the evidence had fully implemented that particular test but whether the test was '*not scientifically available*.' " (Emphasis in original.) See *People v. Rozo*, 2012 IL App (2d) 100308, ¶ 10 (quoting 725 ILCS 5/116-3(a)(2) (West 2008)). Accordingly, defendant cannot meet the requirements of section 116-3(a)(2) of the Code.

¶ 48    Moreover, defendant has not met his burden under section 116-3(c) to establish that retesting of the DNA evidence from the fingernail clippings has the scientific potential to produce new, noncumulative evidence materially relevant to his claim of actual innocence. See 725 ILCS 5/116-3(c)(1) (West 2020).

¶ 49    As discussed, evidence is materially relevant to a claim of actual innocence when it "tends to significantly advance that claim." *Savory*, 197 Ill. 2d at 213. The determination of whether forensic evidence "significantly advances" a defendant's actual innocence claim requires an evaluation of the trial evidence as well as the evidence the defendant seeks to test. *Stoecker*, 2014 IL 115756, ¶ 33. A motion for forensic testing should be granted if the testing holds "even the slight possibility for a favorable result." (Internal quotation marks omitted.) *People v. Morrow*, 2022 IL App (1st) 200388, ¶ 61. Yet, "DNA evidence that plays a minor role and is a collateral issue is not materially relevant because it does not significantly advance a claim of actual innocence." *People v. Gecht*, 386 Ill. App. 3d 578, 582 (2008).

¶ 50    Defendant contends that retesting of the fingernail clippings would result in more "definitive" results, and could reveal "another potential perpetrator." That is, the results of retesting the fingernail clippings could establish that someone, other than defendant, was with Luera at the time of the offenses.

¶ 51    Here, the evidence at trial established that Villalobos, Ramirez, Luera, and defendant were seen together in a vehicle, and that Villalobos and Luera later exited that vehicle and fought, resulting in Villalobos's death. Later, Ramirez's body was recovered from that vehicle, which had been burned, blocks from where defendant purchased cans of gas. Additionally, defendant had burns which he stated he obtained on the Fourth of July and were treated by a physician, but the alleged treating physician denied treating defendant.

¶ 52    Rehnstrom testified that defendant could not be excluded from the DNA mixture under the victim's right hand, and assuming that Ramirez contributed to the mixture under the left hand fingernail clippings, defendant could not be excluded as being the second contributor. Rehnstrom acknowledged the assumption that Ramirez's DNA profile was present in the sample, but asserted (1) even without that assumption, she "still" would have reached the conclusion that defendant could not be excluded, and (2) making such an assumption, that is, that Ramirez's DNA was present on Ramirez's own fingernail scrapings, was a generally accepted practice in DNA analysis. Rehnstrom also admitted that she could not say that the DNA "match[ed]" defendant, only that he could not be excluded from the DNA types present.

¶ 53    While no witness placed defendant at the scene of the offenses and he has maintained his innocence, we are unpersuaded by defendant's argument that retesting would produce new, noncumulative evidence materially relevant to his claim of actual innocence. Even if additional

tests were to reveal that another person was present, the fact remains that defendant has not identified any inaccuracy in the prior testing which concluded that he could not be excluded as a contributor to the DNA recovered from under the fingernail clippings.

¶ 54 Turning to the previously untested Caucasian head hairs found with Ramirez's body, defendant has established a *prima facie* case for forensic testing and that the requested testing would employ a scientific method "generally accepted within the relevant scientific community." See 725 ILCS 5/116-3(b), (c)(2) (West 2020). In the context of the trial evidence, defendant contends that testing the Caucasian head hairs found with Ramirez's body would advance his claim of actual innocence by establishing that someone else was present "around the time of the murder." The State, however, disputes that the requested testing has the potential to produce new evidence materially relevant to defendant's claim of actual innocence. See 725 ILCS 5/116-3(c)(1) (West 2020).

¶ 55 We note that the October 31, 2022, letter upon which defendant relies identifies Exhibit 1 as the victim's—Ramirez's—"head hair samples." Exhibit 1A is then identified as "Head h*ir c**bing" and 1B as "Head hair standard." The letter then states that "Caucasian head hairs" were in Exhibits 1A and 1B. Thus, taken in context, the letter appears to indicate that the Caucasian head hairs belonged to Ramirez. Be that as it may, while the testing of hair found in sensitive areas may be inherently suggestive of intimate contact, that is not the case here. See, *e.g.*, *People v. Grant*, 2016 IL App (3d) 140211, ¶¶ 4, 26 (denial of forensic testing reversed because testing of hair found on the victim's vaginal area could produce evidence of a third-party assailant and undermine the victim's testimony identifying defendant as the only perpetrator). At best, as

defendant concedes, the testing of the Caucasian head hairs could identify another person who was near Ramirez at some time prior to her death.

¶ 56   At trial, the evidence established that Ramirez and five other people, including defendant, were in the vehicle on the night of the murders. Thus, it would not be surprising to discover another person's DNA near Ramirez. Defendant's conclusory assertion that the results of testing the Caucasian head hairs could establish that an unknown individual may have come into contact with Ramirez at some unspecified time prior to the murder does not significantly advance defendant's actual innocence claim. See *Cocroft*, 2020 IL App (1st) 180056, ¶ 21 (well-pleaded facts in a section 116-3 motion are taken as true). Accordingly, defendant has failed to establish that DNA testing of the Caucasian head hairs would produce evidence materially relevant to his claim of actual innocence. See *Stoecker*, 2014 IL 115756, ¶ 33.

¶ 57   Accordingly, we affirm the circuit court's denial of defendant's motion for DNA testing pursuant to section 116-3 of the Code.

¶ 58   Affirmed.