2022 IL App (1st) 191930

No. 1-19-1930

Opinion filed June 9, 2022

Fourth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 02 CR 31134 |
| | ) | |
| PIERRE MONTANEZ, | ) | Honorable |
| | ) | Joseph M. Claps, |
| Defendant-Appellant. | ) | Judge presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Justice Martin concurred in the judgment and opinion.
Justice Rochford specially concurred, with opinion.

**OPINION**

¶ 1     The circuit court denied defendant Pierre Montanez's motion for leave to file a successive

petition for relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.*

(West 2018)). On appeal, defendant contends that the State improperly participated in discussions

at the leave-to-file stage. Defendant also argues that he satisfied the cause and prejudice test on

two *Brady* claims (see *Brady v. Maryland*, 373 U.S. 83 (1963)), namely, a police report contained

in the Chicago Police Department's "basement file" and the entirety of the "basement file." Finally,

defendant argues that he established cause and prejudice on his claim that his mandatory natural

life sentence violates *Miller v. Alabama*, 567 U.S. 460 (2012), and the Illinois proportionate penalties clause (Ill. Const. 1970, art. I, § 11).

¶ 2    For the reasons that follow, we affirm the judgment of the circuit court.[1]

¶ 3                                    I. BACKGROUND

¶ 4    Defendant and codefendant Jose Luera were found guilty after a jury trial of the first degree murders of Roberto Villalobos and Alejandra Ramirez (Ramirez), as well as aggravated vehicular hijacking and aggravated kidnapping. Defendant was sentenced to prison terms of mandatory natural life for the two first degree murder counts, 20 years for aggravated vehicular hijacking, and 27 years for aggravated kidnaping, the latter two sentences to run consecutive to one another and to the first degree murder sentences. We affirmed on direct appeal.

¶ 5    A comprehensive description of the trial evidence can be found in our prior disposition of defendant's direct appeal in *People v. Montanez*, 2014 IL App (1st) 122369-U. We set forth only that evidence which is necessary to review the issues in this appeal.

¶ 6    At trial, Alma Ramirez (Alma), the sister of the victim Ramirez, testified that on August 27, 2002, at about 10 p.m., she saw Villalobos pick up her sister in his vehicle. Other evidence established that Ramirez's body was later found in Villalobos's burned four-door Chevrolet Caprice. Alma confirmed that a photograph depicted Villalobos's vehicle with burn marks, but the burn marks were not there when she observed her sister get into the vehicle that night. Alma identified defendant in court and stated defendant had visited her house two days earlier looking for Ramirez.

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 7 Anais Ortiz testified that on August 27, 2002, she was at codefendant Luera's home with defendant and Claudia Negrette smoking marijuana and drinking alcohol. She knew codefendant through their gang affiliation. At 11:30 p.m., they were all picked up by Villalobos, who was driving a Chevy Caprice with Ramirez in the front passenger seat. Villalobos dropped off Ortiz and Negrette near 83rd Street and Kolin Avenue in Chicago. Defendant and codefendant remained in the car with the two victims. Ortiz did not notice anything unusual happen between the victims and defendants. When shown a photograph of Villalobos's car, Ortiz noted that it had burn marks that were not present on it when she was in the car. Ortiz acknowledged that she was currently in jail awaiting trial on a charge of armed robbery.

¶ 8 John McDonnell testified that on August 28, 2002, around midnight, he was on his front porch in the 7900 block of South Kolin Avenue. McDonnell saw a man "asking for help" exit through the rear driver's side window of a four-door vehicle. The man was subsequently identified as Villalobos. A second, shirtless man, whom McDonnell identified in a photo array as Luera, exited through the same window, punched Villalobos to the ground, and continued to punch him on the ground. McDonnell approached but saw a flash of light that he thought came from inside the vehicle. He hesitated because he thought "there could be more people inside the car." Luera stood up, Villalobos hid behind McDonnell, and Luera drew a knife. McDonnell then ran behind his house and picked up a piece of lumber. When he returned, the vehicle drove away, and Villalobos was lying on McDonnell's driveway with multiple stab wounds. McDonnell confirmed that a photograph depicted the same vehicle he saw that night. On cross-examination, McDonnell stated he could not see any other people or movements inside the vehicle but saw the light inside the vehicle.

¶ 9     Jason Samhan testified that shortly after midnight on August 28, 2002, he saw a Chevrolet Caprice drive through a red light at the intersection of 79th Street and Tripp Avenue. The vehicle had blood on the rear driver's side door, and a man's arm was choking a woman's neck with her head "out the back window." Samhan confirmed that a photograph depicted the vehicle he saw that night but with additional burn marks he had not seen.

¶ 10    George Hoyt testified that at about 1:45 a.m. on August 28, 2002, he was working at a gas station on 67th Street and Pulaski Road. Defendant, whom Hoyt identified in court, entered with "scratches upon his face and neck area" and grabbed two one-gallon gas cans. Hoyt told defendant it would be cheaper to buy one can, fill his vehicle with gas, and drive to the gas station for more gas. Nonetheless, defendant purchased the two cans and left. Later that evening, Hoyt told a police officer about defendant's purchase and gave the officer a receipt of defendant's purchase, which was entered into evidence. Hoyt also identified defendant from a photo array and a lineup.

¶ 11    Samson Murray testified that at about 1:45 a.m. on August 28, 2002, he was outside a restaurant near the intersection of 67th Street and Pulaski Road with Nick Buogos. Defendant, whom Murray identified in court and described as a friend of Buogos, approached from the nearby gas station carrying two gas cans and said, "I need to talk to you." Buogos asked Murray to wait for him in the restaurant and drove away with defendant in Buogos's vehicle.

¶ 12    Chicago police officer Joseph William Dunigan Jr. testified that shortly after midnight on August 28, 2002, he arrived at the 7900 block of South Kolin Avenue and saw Villalobos's body covered by a sheet on a driveway. He then went to the 3700 block of West 69th Street and saw a Chevrolet four-door vehicle with blood on the exterior driver's side and fire damage and a "bloody" deceased woman in the rear driver's side seat. Dunigan stated there was a large quantity

of water on the ground and a "strong odor of gasoline." The parties stipulated to testimony that charred debris was collected from inside the Chevrolet Caprice and an Illinois State Police forensic chemist tested the debris and found it contained gasoline.

¶ 13    Illinois State Police forensic DNA analyst Amy Rehnstrom testified that she received known DNA samples from Ramirez, codefendant, defendant, and Villalobos. She also received unknown samples of bodily fluids recovered from the crime scenes as well as swabs from Ramirez's fingernails. She compared the DNA samples from the crime scene to the standards provided by each individual to determine who could have contributed to the samples from the crime scene and who definitely could not have contributed to them. Rehnstrom testified that she analyzed DNA from Ramirez's right-hand fingernail clippings and could not exclude defendant, Ramirez, or Villalobos as having contributed to the DNA profile, but could exclude Luera. She also analyzed DNA from Ramirez's left-hand fingernail clippings and found that it contained a combination of two DNA profiles, and she could not exclude defendant as being one of the contributors.

¶ 14    Cook County deputy medical examiner Dr. James Filkins testified that he reviewed the autopsies of Ramirez and Villalobos. Dr. Filkins opined that Villalobos "died of multiple stab and incise wounds" and Ramirez's primary cause of death was "multiple stab wounds," with strangulation being a "significant contributing factor." He also observed that Ramirez had burn injuries that appeared to be inflicted postmortem.

¶ 15    Chicago police detective Robert Lenihan testified that on November 16, 2002, he interviewed defendant in the presence of defendant's attorneys. Lenihan observed what looked like a burn scar on defendant's left arm near the wrist. Defendant stated he had burned his left arm

and right leg on the Fourth of July. During the interview, defendant produced for Lenihan a prescription for a cream used to treat burns, as well as a doctor's note dated "July" and signed by "Dr. E. Cabrera," both of which were entered into evidence at trial. The parties stipulated that, if called to testify, Dr. Ernest Cabrera would state that he has never treated defendant "at any time for any reason" and did not sign the doctor's note.

¶ 16    The jury found defendant guilty of the first degree murders of Villalobos and Ramirez, aggravated vehicular hijacking, and aggravated kidnaping. The trial court sentenced him to mandatory natural life for the two first degree murder counts and prison sentences of 20 years for aggravated vehicular hijacking and 27 years for aggravated kidnaping to run consecutive to one another and to the first degree murder sentences.

¶ 17    On direct appeal, defendant's sole argument was that the State engaged in prosecutorial misconduct in closing argument by misstating the trial evidence. We affirmed. *Montanez*, 2014 IL App (1st) 122369-U, ¶ 25.

¶ 18    Defendant filed his first postconviction petition in December 2014. In March 2015, defendant's petition was docketed for second-stage proceedings and defendant was appointed counsel. At a March 2016 hearing, defendant was permitted to proceed *pro se*. In April 2016, defendant filed his *pro se* "first amended" postconviction petition. In June 2016, defendant filed a *pro se* "motion to vacate judgment," alleging that the State had suppressed evidence regarding Ortiz's plea deal. In August 2017, the trial court granted the State's motion to dismiss defendant's postconviction petition.

¶ 19    Defendant then filed a motion to amend his postconviction petition a second time, a "supplemental" motion to amend the petition, a timely motion to reconsider the dismissal of his

petition, an "addendum" to his proposed second amended postconviction petition, and a "supplemental" motion for reconsideration of the dismissal, among many other filings. On February 15, 2018, the trial court denied defendant's motion to amend his postconviction petition.[2]

¶ 20    On May 2, 2018, while defendant's motion to reconsider the dismissal of his postconviction was pending, defendant brought a letter from attorney Candace Gorman to the trial court's attention. The letter indicated that Gorman found a Chicago police file related to defendant's case. The parties and the trial court spent the next several months locating and reviewing the files and then litigating defendant's access to the files. On May 21, 2018, the trial court stated that Gorman had the files and directed Assistant State's Attorney (ASA) Linda Walls to contact her. On June 28, 2018, the State represented that the basement files could only be obtained via subpoena. With defendant's permission, the trial court directed the State to issue a subpoena returnable to the trial court. On July 31, 2018, ASA Walls stated that she had reviewed the basement files and compared the files to what was tendered to the defense pretrial. ASA Walls stated that one report was in a different format but that the exact content of that report was contained in a larger report. The trial court directed ASA Walls to turn that report over to defendant.

¶ 21    Defendant then questioned the propriety of the State's review of the files as opposed to an in camera review by the trial court. The trial court stated that it trusted ASA Walls as an officer of the court that the only relevant document in the basement files was the one police report. Defendant

---

[2]Despite the trial court's denial of defendant's motion to amend his postconviction petition, defendant attempted to file multiple amended petitions. On January 22, 2018, defendant filed an addendum to his second amended postconviction petition where he argued that his mandatory natural life sentence violated the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). On September 17, 2018, defendant filed a third amended petition for postconviction relief, raising a *Brady* issue related to the police report that is the basis of one of his current claims. As these amendments were not sanctioned by the trial court, they were never ruled on.

filed a motion to substitute Judge Ursula Walowski in which he argued that it was Judge Walowski's responsibility to review the basement files and that Judge Walowski erred in allowing ASA Walls to review the basement files. Defendant's motion to substitute Judge Walowski was denied.

¶ 22    On November 29, 2018, the trial court denied defendant's motion to reconsider the dismissal of his postconviction petition and dismissed defendant's section 2-1401 petition. See 735 ILCS 5/2-1401 (West 2018).

¶ 23    Defendant appealed the dismissal of his postconviction petition and argued that he made a substantial showing that the State violated *Brady* by failing to disclose that Ortiz had entered into a plea agreement prior to testifying against him at trial. This court affirmed the second-stage dismissal of defendant's postconviction petition because the proffered impeachment evidence was not material to defendant's guilt or innocence. *People v. Montanez*, 2021 IL App (1st) 191065-U, ¶ 53. Defendant also appealed the dismissal of his section 2-1401 petition. This court affirmed the dismissal of defendant's section 2-1401 petition after appellate counsel filed a motion to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987). *People v. Montanez*, No. 1-19-0017 (2020) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 24    While those appeals were pending, on April 22, 2019, defendant filed a motion for leave to file a successive postconviction petition. Defendant raised two claims. First, defendant alleged that the State violated *Brady*, 373 U.S. 83, in that the State failed to turn over a police report that would have affected the credibility of multiple witnesses for the State. Second, defendant alleged that his mandatory life sentence violated the eighth amendment of the United States Constitution and the proportionate penalties clause under *Miller* and its progeny. The trial court denied

defendant's motion for leave to file a successive postconviction petition. Defendant appeals the trial court's judgment.

¶ 25                                   II. ANALYSIS

¶ 26     The Act provides a three-stage mechanism by which a criminal defendant may assert that his conviction resulted from the substantial denial of a constitutional right. *People v. Myles*, 2020 IL App (1st) 171964, ¶ 17; *People v. Delton*, 227 Ill. 2d 247, 253 (2008). "[T]he Act contemplates the filing of only one post-conviction petition." *People v. Pitsonbarger*, 205 Ill. 2d 444, 456 (2002). "Any claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived." 725 ILCS 5/122-3 (West 2018). "Only when fundamental fairness so requires will the strict application of this statutory bar be relaxed." *Pitsonbarger*, 205 Ill. 2d at 458.

¶ 27     "[T]he cause-and-prejudice test is the analytical tool that is to be used to determine whether fundamental fairness requires that an exception be made to section 122-3 so that a claim raised in a successive petition may be considered on its merits." *Id.* at 459. The cause-and-prejudice test has been codified in the Act. Section 122-1(f) of the Act provides: "Leave of court may be granted only if a petitioner demonstrates cause for his or her failure to bring the claim in his or her initial post-conviction proceedings and prejudice results from that failure." 725 ILCS 5/122-1(f) (West 2018). Thus, section 122-1(f) is an exception to the statutory waiver rule "permitting a successive petition, but only if the defendant first obtains permission from the court and demonstrates to the court cause and prejudice for not having raised the alleged errors in his or her initial postconviction petition." *People v. Bailey*, 2017 IL 121450, ¶ 15.

¶ 28    "[A] prisoner shows cause by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings ***." (Internal quotation marks omitted.) *Id.* ¶ 14. "[A] prisoner shows prejudice by demonstrating that the claim not raised during his or her initial post-conviction proceedings so infected the trial that the resulting conviction or sentence violated due process." (Internal quotation marks omitted.) *Id.* "[T]he cause-and-prejudice test for a successive petition involves a higher standard than the first-stage frivolous or patently without merit standard ***." *People v. Smith*, 2014 IL 115946, ¶ 35.

¶ 29    "[L]eave of court to file a successive postconviction petition should be denied when it is clear, from a review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings." *Id.* "The denial of a defendant's motion for leave to file a successive postconviction petition is reviewed *de novo*." *Bailey*, 2017 IL 121450, ¶ 13.

¶ 30                    A. State's Improper Participation Claim

¶ 31    Defendant first argues that a remand is "necessary because the proceedings on [his] successive post-conviction petition were tainted by the State's premature and fundamentally unfair participation at the leave-to-file stage." Defendant relies on *Bailey*, 2017 IL 121450. In *Bailey*, the Illinois Supreme Court was tasked with deciding whether "the denial of defendant's motion for leave to file a successive postconviction petition must be reversed because the circuit court permitted the State to provide input on the merits of the motion and petition at the cause and prejudice stage." *Id.* ¶ 12.

¶ 32 The court held that "the State should not be permitted to participate at the cause and prejudice stage of successive postconviction proceedings." *Id.* ¶ 24. The court stated that trial courts are "capable of making an independent determination on the legal question of whether adequate facts have been alleged for a *prima facie* showing of cause and prejudice." *Id.* ¶ 25. "[P]ermitting the State to argue against a finding of cause and prejudice at this preliminary stage, when the defendant is not represented by counsel, is inequitable, fundamentally unfair, and raises due process concerns." *Id.* ¶ 27. While the court held that the State had improperly participated at the leave-to-file stage, the court nonetheless opted to review the defendant's motion for leave to file his successive postconviction petition in the interest of judicial economy. *Id.* ¶ 42.

¶ 33 Defendant complains about the State's participation in discussions about whether, and to what extent, defendant should have access to files found at a Chicago Police Department facility. These discussions took place between May and November 2018 during second-stage proceedings on defendant's initial postconviction petition. Defendant filed his motion for leave to file a successive postconviction petition, which is at issue in this case, in April 2019.

¶ 34 We reject defendant's invitation to extend *Bailey* to these circumstances. *Bailey*, and defendant's other case, *People v. Coffey*, 2020 IL App (3d) 160427, both involved procedural postures where the defendants had already filed a motion for leave to file a successive postconviction petition. Thus, there was active litigation on whether the defendants should be granted leave to file a successive postconviction petition. Here, on the other hand, defendant had neither filed his motion nor gave any indication that a motion for leave to file was imminent.

¶ 35 Aside from the procedural distinction between this case and *Bailey*, it would also be impractical to find error in the State's participation under the facts of this case. Defendant had filed

an initial postconviction petition, which was at the second stage of proceedings. A motion to reconsider the dismissal of the petition was pending when the basement files issue first arose. Defendant had also filed a section 2-1401 petition. While litigating those filings, defendant brought up a letter from attorney Gorman, which stated that she had found files related to defendant's case. The trial court then directed the State to contact Gorman to determine the relevancy of the files. Just before the State tendered the police report, defendant stated to the trial court that he would possibly amend his filings depending on the contents of the report.

¶ 36    Thus, defendant raised the specter of utilizing the basement files in the pending litigation. The State properly participated in those proceedings, and no *Bailey* violation occurred.

¶ 37                                  B. *Brady* Claims

¶ 38    Defendant's first substantive argument is that he adequately alleged cause and prejudice regarding two *Brady* claims. Both claims stem from the basement file found at a Chicago Police Department facility. The file was found by attorney Gorman. Gorman notified defendant of the existence of the file in December 2015. The trial court issued a subpoena for the file, and the ASA was directed to review the file and tender anything to defendant that was not tendered to the defense prior to trial. The State turned over a single police report, which the ASA represented was the only record not tendered to the defense prior to trial. The ASA represented that the contents of the police report were nonetheless included within a larger document. Defendant's first claim relates to the police report that includes a summary of statements made by several State witnesses. The second claim relates to the entirety of the basement file, the contents of which are not in the record.

¶ 39    In *Brady*, the United States Supreme Court held that "the prosecution must disclose evidence that is favorable to the accused and 'material either to guilt or to punishment.' " *People v. Harris*, 206 Ill. 2d 293, 311 (2002) (quoting *Brady*, 373 U.S. at 87). To succeed on a *Brady* claim, a defendant must establish: "(1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either willfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment." *People v. Beaman*, 229 Ill. 2d 56, 73-74 (2008). "Evidence is material if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed." *Id.* at 74. To establish materiality, a defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

¶ 40    We can dispose of defendant's second *Brady* claim first because defendant never raised a claim related to the entirety of the basement file in his successive petition. Section 122-2 of the Act specifically provides that "[t]he petition shall *** clearly set forth the respects in which petitioner's constitutional rights were violated" (725 ILCS 5/122-2 (West 2018)), while section 122-3 provides that "[a]ny claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived" (*id.* § 122-3). It is black letter law that a defendant may not raise an issue for the first time on appeal from the dismissal of a postconviction petition if the petition failed to include that issue. *People v. Jones*, 211 Ill. 2d 140, 148 (2004); *People v. Coleman*, 183 Ill. 2d 366, 388 (1998); *People v. McNeal*, 194 Ill. 2d 135, 153 (2000); *People v. Jones*, 213 Ill. 2d 498, 505-06 (2004); *People v. Petrenko*, 237 Ill. 2d 490, 502 (2010).

¶ 41    Defendant points to the last sentence of defendant's first claim, which was titled, "The State failed to turn over a police report which would have affected the credibility of multiple witnesses for the State in violation of *Brady v. Maryland*, 373 U.S. 83 (1963)." At the end of the section, defendant argued cumulative prejudice in that two pieces of evidence had been suppressed; namely, the existence of a plea agreement for witness Anais Ortiz[3] and "documents from over (17) years ago, hidden in file cabinets by agents of the State." This statement is clearly a reference to the police report because the report is the subject of the entirety of defendant's first claim. The statement is not a reference to the entirety of the basement files because defendant does not otherwise discuss the entirety of the files or claim error in the trial court's discovery-related rulings regarding the basement files. Because defendant did not raise a claim related to the entirety of the basement files in his petition, he has waived review of that claim.

¶ 42    The *Brady* claim defendant did raise in his motion for leave to file relates to a police report that contains statements of various witnesses. Defendant argues that McDonnell's statements in the police report differ significantly from his trial testimony. In the police reports, McDonnell told officers that he did not see any offenders leaving the scene. At trial, McDonnell testified that he saw the offender's vehicle leave the scene. McDonnell also testified that he saw a little flash of light in the car while codefendant Luera was outside of the car, which made McDonnell think there was another individual in the car. The police report does not mention the flash of light. Defendant concludes that his petition demonstrated that the police report contained material evidence that

---

[3]This evidence was the basis for defendant's *Brady* claim in his initial postconviction petition. This court affirmed the second-stage dismissal of the initial postconviction petition in a prior appeal. *Montanez*, 2021 IL App (1st) 191065-U, ¶ 2.

could have both impeached a key State's witness and exculpated himself because the report suggests codefendant Luera committed the crimes alone.

¶ 43     We can decide this issue without resolution of whether defendant established cause sufficient to file the successive postconviction petition because he cannot establish prejudice. In resolving defendant's appeal from the dismissal of his initial postconviction petition, this court noted the "ample" evidence supporting his guilt. This court stated:

> "The State presented ample evidence that defendant was, at a minimum, accountable for the murders of Villalobos and Ramirez while in Villalobos's vehicle with Luera where he was seen in the vehicle with the victims, he had scratches on his neck, his DNA was found under Ramirez's fingernails, Villalobos's vehicle was burned with Ramirez's body inside it, defendant purchased two cans of gasoline not long after Luera had killed Villalobos and Samhan saw the vehicle drive by with a woman being strangled out the window, and defendant lied about where he sustained the burn on his arm." *Montanez*, 2021 IL App (1st) 191065-U, ¶ 52.

Notably, there is no mention of McDonnell's testimony because McDonnell shed little to no light on whether defendant was involved in the murders of Villalobos and Ramirez. In other words, even assuming defendant could have impeached McDonnell on whether he saw a flash of light in the vehicle or whether he saw Villalobos's vehicle drive away, defendant would not have been exculpated nor would the evidence tend to show that there was only one perpetrator.

¶ 44     Ortiz placed defendant in Villalobos's vehicle with Luera, Villalobos, and Ramirez minutes before Luera murdered Villalobos. Moments after the murder, Samhan witnessed Villalobos's

vehicle traveling recklessly. A woman's head was hanging out the back window with a male's arm around her neck. These two pieces of evidence together provide strong evidence that not only were two people in the vehicle with Ramirez, but that the two people were Luera and defendant. Aside from the evidence about defendant's presence in the vehicle, there was testimony that defendant had scratches on his face and neck shortly after Samhan saw a man choking a woman in Villalobos's vehicle. Defendant's DNA could not be excluded from the DNA profile found under Ramirez's fingernails and the odds of another person not being excluded were astronomical. As we noted, this evidence supported "a reasonable inference that Ramirez was the one who caused defendant's scratch marks."

¶ 45    On top of the evidence that defendant was an active participant in Ramirez's murder, "abundant evidence" established that defendant purchased two cans of gasoline to burn the Caprice with Ramirez inside it. A gas station attendant testified that defendant bought two cans of gasoline around 1:45 a.m. the night of the murders. Murray then saw defendant walk up to a restaurant near the gas station with two cans of gasoline. The officer who found the Caprice with Ramirez's body inside noted fire damage and a strong odor of gasoline. Debris inside the vehicle contained gasoline. A detective noted a burn scar on defendant's arm, and defendant provided a forged doctor's note to explain the burn scar defendant received from burning Villalobos's vehicle.

¶ 46    In short, even if defendant could have impeached McDonnell with the two discrepancies between the police report and his testimony, we have full confidence in the jury's guilty verdicts. Thus, the impeachment evidence was not material to defendant's guilt or innocence. See *People v. Roman*, 2016 IL App (1st) 141740, ¶ 18 (noting that "impeachment evidence may not be material where the State's remaining evidence is strong enough to preserve confidence in the

verdict"). Because defendant cannot establish prejudice for his failure to raise the *Brady* claim in his initial postconviction petition, the trial court properly denied defendant leave to file his successive postconviction petition.

¶ 47                                    C. *Miller* and Proportionate Penalties Claim

¶ 48    Defendant's final argument is that he established cause and prejudice in relation to his claim that his mandatory life sentence violates *Miller* and the proportionate penalties clause "because he was 21, an emerging adult, at the time the offense was committed, and his sentencing hearing did not consider the attendant circumstances of his youth."

¶ 49    The eighth amendment to the United States Constitution prohibits the infliction of "cruel and unusual punishments." U.S. Const., amend. VIII. In a line of cases the United States Supreme Court has applied the eighth amendment to juvenile offenders who have committed serious offenses. In *Roper v. Simmons*, 543 U.S. 551, 578 (2005), the Court held that the eighth amendment prohibited the "imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." In *Graham v. Florida*, 560 U.S. 48, 82 (2010), the Court held that the "Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide."

¶ 50    In *Miller*, the Court held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Miller*, 567 U.S. at 479. The Court then determined that the *Miller* holding applied retroactively to cases on collateral review. *Montgomery v. Louisiana*, 577 U.S. 190, 212 (2016). Most recently, the Court clarified that *Miller* only required a "discretionary sentencing procedure" and not any formal factual finding. *Jones v. Mississippi*, 593 U.S. ___, ___, 141 S. Ct. 1307, 1317 (2021).

¶ 51 The Illinois Supreme Court has also weighed in on the import of these decisions. Our supreme court in *People v. Reyes*, 2016 IL 119271, ¶¶ 9-10, held that *Miller* applied to *de facto* life sentences. In *People v. Buffer*, 2019 IL 122327, ¶ 41, our supreme court defined a *de facto* life sentence for a juvenile as a sentence of more than 40 years' imprisonment. Our supreme court has also held that *Miller* applies to discretionary as well as mandatory sentences (*People v. Holman*, 2017 IL 120655, ¶¶ 43-44), although the court has subsequently called that holding into question (see *People v. Dorsey*, 2021 IL 123010, ¶ 41).

¶ 52 Defendant's eighth amendment claim fails because he was 21 years old when he committed the murders in this case. The Illinois Supreme Court has made clear that, "for sentencing purposes, the age of 18 marks the present line between juveniles and adults." *People v. Harris*, 2018 IL 121932, ¶ 61 (rejecting the 18-year-old defendant's eighth amendment challenge because the defendant fell on the adult side of the dividing line); *Miller*, 567 U.S. at 465 (limiting the Court's holding to "those under the age of 18 at the time of their crimes"). Because defendant was over 18 when he committed the crimes in this case, he cannot establish prejudice warranting leave to file a successive postconviction petition on his eighth amendment claim.

¶ 53 The proportionate penalties clause provides: "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. The Illinois Supreme Court has twice indicated that young adult offenders may establish an unconstitutional life sentence through a postconviction petition. In *People v. Thompson*, 2015 IL 118151, ¶ 44, our supreme court rejected the 19-year-old defendant's as-applied constitutional challenge because it was raised for the first time on appeal. However, the court noted that the defendant was not prohibited from raising the issue

through the Act. *Id.* In *Harris*, our supreme court reversed the appellate court's decision because the "appellate court held [the] defendant's sentence violated the Illinois Constitution without a developed evidentiary record on the as-applied constitutional challenge." *Harris*, 2018 IL 121932, ¶ 40. The court concluded that because *Miller* did not apply directly to the 18-year-old defendant's circumstances, the record must be sufficiently developed to support the defendant's as-applied challenge. *Id.* ¶ 45.

¶ 54   We have described the import of *Thompson* and *Harris* as permitting "young adult offenders to bring successive postconviction claims alleging that their sentences in excess of 40 years imposed without consideration of the *Miller* factors are unconstitutional as applied to them under the proportionate penalties clause." *People v. Horshaw*, 2021 IL App (1st) 182047, ¶ 69. The key question in this case is whether defendant falls into the category of "young adult offenders." If so, we would proceed to determine whether defendant sufficiently alleged cause and prejudice to warrant the filing of his successive postconviction petition. If not, defendant cannot establish prejudice and the trial court properly denied the motion for leave to file.

¶ 55   The vast majority of our cases have drawn a bright line at 21 years old in determining who qualifies as a "young adult offender." For example, in *People v. Humphrey*, 2020 IL App (1st) 172837, ¶ 33, this court held that "individuals who are 21 years or older when they commit an offense are adults for purposes of a *Miller* claim." This court relied on "other aspects of criminal law and society's current general recognition that 21 is considered the beginning of adulthood." *Id.* ¶ 34. For the criminal law context, this court cited the legislature's decision to grant parole review to homicide offenders, who were under 21 at the time of the offense, after serving 20 years of their sentence. *Id.* (citing 730 ILCS 5/5-4.5-115 (West Supp. 2019)). This court also cited the

statutory prohibitions against the sale of nicotine, tobacco, and alcohol products to those under 21. *Id.* (citing 720 ILCS 675/1 (West Supp. 2019); 235 ILCS 5/6-16 (West 2016)).

¶ 56    *Humphrey* is consistent on this issue with nearly every other case from our appellate court. See *People v. Kruger*, 2021 IL App (4th) 190687, ¶ 32 ("We agree with the *Humphrey* court limiting *Miller*-based claims to those young adults aged 18 to 20."); *People v. Green*, 2022 IL App (1st) 200749, ¶ 42 ("[D]efendant was 21 years old at the time of the offense, and therefore was an adult for purposes of a *Miller* claim."); *People v. Suggs*, 2020 IL App (2d) 170632, ¶ 35 (noting that the defendant could not "point to any line, societal, legal, or penological, that is older than 21 years"); *People v. Glinsey*, 2021 IL App (1st) 191145, ¶ 46 (noting that "our state's statutes and caselaw treat young adults under 21 years of age differently than adults"); *People v. Rivera*, 2020 IL App (1st) 171430, ¶ 27 (recognizing that *Miller* protections "have been arguably extended in some cases and statutes to under-21-year-olds," but that any further extension "should be made by our legislature or our highest court"); *People v. Williams*, 2021 IL App (1st) 190535, ¶ 35 (rejecting a 22-year-old defendant's proportionate penalties claim because it could not be said that "the legislature's decision to define adulthood as being 21 years old or older shocks the moral sense of the community").

¶ 57    In one instance this court has held that a defendant 21-years-old or older may potentially invoke the *Miller* protections. In *People v. Savage*, 2020 IL App (1st) 173135, ¶ 67, this court began by noting the general rule that "Illinois law treats adults under 21 years of age differently than adults." However, this court accepted the defendant's argument that mental health issues and drug addiction may lower a defendant's functional age. *Id.* ¶ 70. The defendant's petition alleged that "he had been a drug addict since he was nine years old, that he was using drugs every day at

the time of the offense, and that he was attempting to rob a drug house when the offenses at issue occurred." *Id.* ¶ 71. These allegations were supported by the trial record and documents filed with the PSI, all of which further supported the postconviction claim that the defendant's long-term addiction and young age left him " 'more susceptible to peer pressure' " and " 'more volatile in emotionally charged settings.' " *Id.* ¶¶ 71-73. This court concluded that, "where [the] defendant's argument finds support in both the filed record and recent case law, it cannot be considered frivolous and patently without merit." *Id.* ¶ 76.

¶ 58    We conclude that defendant cannot establish prejudice based on the significant precedent setting the dividing line for *Miller* protections at 21-years-old. Defendant, who was 21 at the time of the offenses in this case, falls on the adult side of the dividing line. As noted in *Rivera*, any extension of *Miller* protections to those 21 and over should come from the legislature or the Illinois Supreme Court. *Rivera*, 2020 IL App (1st) 171430, ¶ 27. Our supreme court has recognized that the legislature is "the entity best suited" to make determinations regarding compliance with constitutional mandates in the juvenile sentencing arena. *Buffer*, 2019 IL 122327, ¶ 40 (relying on legislative enactments to conclude that a sentence of over 40 years constitutes a *de facto* life sentence for *Miller* purposes); *Graham*, 560 U.S. at 75 (noting that it is "for the State, in the first instance, to explore the means and mechanisms for compliance" with eighth amendment mandates in juvenile sentencing).

¶ 59    The legislature has taken significant steps in implementing *Miller* protections. Trial courts are now mandated to consider, when sentencing individuals who were under 18 at the time of the offense, several additional mitigating factors related to the individual's youth and upbringing. 730 ILCS 5/5-4.5-105(a) (West 2020). For those same individuals, trial courts have the discretion

in most cases to decline to impose otherwise applicable sentencing enhancements. *Id.* § 5-4.5-105(b). The legislature has also provided for parole review after 20 years for first degree murder offenders who were under 21 at the time of the crime. *Id.* § 5-4.5-115. The Illinois Supreme Court, for its part, has suggested that 18-to-20-year-olds may raise as-applied challenges under the proportionate penalties clause based on the reasoning in *Miller*, which is "already a significant extension of *Miller*." *Kruger*, 2021 IL App (4th) 190687, ¶ 32.

¶ 60    In short, any further extension of *Miller* should come from either the legislature or the Illinois Supreme Court. Because defendant, as a 21-year-old adult, failed to make a *prima facie* showing of prejudice, the circuit court properly denied his motion for leave to file a successive postconviction petition.

¶ 61    To the extent *Savage* represents an avenue for individuals 21 and over to obtain relief based on *Miller*, this case is distinguishable. First, the burden on defendant in this case is higher as he is attempting to file a successive postconviction petition whereas the defendant in *Savage* filed an initial postconviction petition. As we have consistently held, "the pleading requirements for successive postconviction petitions are higher than the pleading requirements for initial postconviction petitions." *Horshaw*, 2021 IL App (1st) 182047, ¶ 134. Second, and more importantly, the defendant in *Savage* listed specific factors, drug addiction and mental health, which were supported by the record, in alleging that *Miller* protections should apply to him. *Savage*, 2020 IL App (1st) 173135, ¶ 78.

¶ 62    Here, on the other hand, defendant concedes that he pointed to no "specific issues" that would warrant the extension of *Miller* to his case. A bare bones assertion that *Miller* should be applied based solely on an individual's age is insufficient to make out a *prima facie* case of

prejudice. See *People v. Carrion*, 2020 IL App (1st) 171001, ¶ 38 (finding an insufficient allegation of prejudice where the defendant made a "flat allegation as to evolving science on juvenile maturity and brain development"); *People v. Evans*, 2021 IL App (1st) 172809, ¶ 20 (affirming the denial of leave to file a successive postconviction petition where the "defendant's petition failed to set forth *any* individual characteristics that would require the trial court to apply the sentencing protections set forth in *Miller*" (emphasis in original)). Thus, even assuming *Miller* could be applied to a 21-year-old defendant under the proportionate penalties clause, defendant failed to sufficiently allege prejudice and his motion for leave to file a successive postconviction petition was properly denied.

¶ 63                                            III. CONCLUSION

¶ 64    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 65    Affirmed.

¶ 66    JUSTICE ROCHFORD, specially concurring:

¶ 67    I concur in the result affirming the denial of defendant's motion for leave to file a successive postconviction petition. I write separately because with respect to defendant's proportionate penalties claim, I would affirm based on his failure to satisfy the cause prong of the cause-and-prejudice test.

¶ 68    Recently, the supreme court in *Dorsey*, 2021 IL 123010, ¶ 74, found that "*Miller*'s announcement of a new substantive rule under the eighth amendment does not provide cause for a defendant to raise a claim under the proportionate penalties clause." The supreme court reasoned: "Illinois courts have long recognized the differences between persons of mature age and those who are minors for purposes of sentencing. Thus, *Miller*'s unavailability prior to 2012 at best deprived

defendant of 'some helpful support' for his state constitutional law claim, which is insufficient to establish 'cause.' " *Id.* (quoting *People v. LaPointe*, 2018 IL App (2d) 160903, ¶ 59).

¶ 69    Dorsey indicates that any unavailability of *Miller* and its progeny prior to the date of the filing of the initial postconviction petition did not prevent defendant from raising a proportionate penalties claim based on the sentencing court's failure to consider his youth and its attendant characteristics. In light of *Dorsey*, defendant cannot establish cause for failing to raise his proportionate penalties claim in his initial petition, and I would affirm on that basis without addressing the prejudice prong. See also *People v. Ruddock*, 2022 IL App (1st) 173023, ¶ 72 (finding the juvenile defendant relying on *Miller* and its progeny did not establish cause for failing to bring a proportionate penalties claim in an earlier postconviction petition); *People v. Howard*, 2021 IL App (2d) 190695, ¶ 39 (finding the young adult offender relying on *Miller* and its progeny did not establish cause for failing to bring a proportionate penalties claim in an earlier postconviction petition); *People v. Haines*, 2021 IL App (4th) 190612, ¶¶ 38-47 (finding the same for a young adult offender).

---

2022 IL App (1st) 191930

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 02-CR-31134; the Hon. Joseph M. Claps, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Adrienne E. Sloan, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham and Brian K. Hodes, Assistant State's Attorneys, of counsel), for the People. |

---