2025 IL App (1st) 1230531-U

SECOND DIVISION
February 25, 2025

No. 1-23-0531

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

---

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

---

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 13178 |
| | ) | |
| ADAM RUIZ, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Petitioner-Appellant. | ) | Judge Presiding. |

---

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Van Tine and Justice Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Affirmed. First-stage dismissal of postconviction petition was proper. Petition did not allege arguable violation of proportionate penalties clause for 21-year-old sentenced to mandatory life imprisonment under multiple-murder statute. Counsel was not arguably ineffective for failing to interview witnesses or obtain surveillance video, as petitioner failed to attach witness affidavits or any objective evidence that alleged video exists.

¶ 2    A jury convicted petitioner Adam Ruiz of the murder of his roommates, Samantha Welch and Celia Cruz-Reyes. Petitioner, who was 21 years old, and thus a legal adult at the time of the murders, was sentenced to mandatory life imprisonment. We affirmed his convictions on direct appeal (*People v. Ruiz*, 2020 IL App (1st) 171439-U), and the circuit court dismissed his *pro se* post-conviction petition at the first stage. He now appeals from that ruling, arguing that he raised two arguable claims: a proportionate-penalties challenge to his mandatory life sentence, and a

claim of ineffective assistance of trial counsel. We affirm.

¶ 3                                          BACKGROUND

¶ 4      The underlying facts and trial evidence are set forth in detail in our decision on direct appeal. *Id.* ¶¶ 5-33. For our limited purposes here, a brief sketch will suffice.

¶ 5      In the Fall of 2014, petitioner shared a basement apartment in a three-flat building with four other young adults: his girlfriend, Andrea Bobadilla; his friend, Andrea Luna; and his half-sister Samantha Welch and her girlfriend Celia Cruz-Reyes, the two victims. After Luna moved out, the remaining roommates argued about how to reallocate her share of the rent. The dispute culminated in a face-to-face confrontation, principally between petitioner and Welch. What we know about that confrontation comes from petitioner's own trial testimony. In short, Welch threw something at petitioner and took a swing at him, missing him both times. Though petitioner would tell the rest of the story differently, the evidence tended to show, and the jury evidently believed, that petitioner responded by choking both Welch and Cruz-Reyes, and then setting the apartment on fire.

¶ 6      The medical examiner confirmed that Cruz-Reyes was strangled to death, and that she died before the fire was set. It was unclear whether Welch died as a result of strangulation or smoke inhalation, but either way, her death was a homicide. The fire marshal found that the sofa in the living room had been doused in gasoline, and that the unit's smoke detectors, which had been present during an inspection six days earlier, had been removed—all strongly suggesting an intentional arson.

¶ 7      Cell-site location information placed a cell phone in Bobadilla's name at the apartment when the fire was set. The State presented evidence that petitioner shared Bobadilla's phone, and that a police officer noticed a strong smell of gasoline in petitioner's car the next day.

¶ 8     A few months later, petitioner moved to Denver, Colorado, where he stayed with his foster father's best friend, John Harrington, and Harrington's husband, Robert Dunn. Harrington testified that he stayed up late one night, drinking and talking with petitioner. The conversation turned to petitioner's past. Petitioner soon grew upset and admitted that he strangled Welch and "burned the bodies" of the two victims. Later that night, petitioner posted this message on Facebook: "Finally was able to release a great truth—feeling relaxed."

¶ 9     Harrington and Dunn jointly confronted petitioner about these revelations. Petitioner called his foster father, Shawn LeFleuer, who asked him, "Did you do it?" Petitioner paused and answered, "Yes sir." LeFleur told petitioner to "man up," and petitioner called the Denver police to turn himself in. While awaiting extradition to Chicago, petitioner attempted suicide, leaving a note that read: "I have decided that I am not worth keeping on this earth and that everyone is better off without a guy that killed his own sister."

¶ 10     In his own testimony, petitioner acknowledged that he put Welch in a "choke hold" until her body went limp and she started "snoring." Petitioner laid her down on the floor, alive, and when he turned around, he saw Cruz-Reyes on the floor in the hallway. Like Welch, she was "snoring." Petitioner assumed she had been in a fight with Bobadilla, as they had been yelling at each other, but he did not see what happened between them. He "freaked out," but Bobadilla told him to relax, so he went out to the car to smoke a cigarette. Fifteen minutes later, Bobadilla came outside, and they drove away. Petitioner did not learn about the fire until his brother, Xavier Ruiz, told him about it the next day.

¶ 11     Petitioner testified that when he told Harrington that he killed Welch and Cruz-Reyes, he did not literally mean that he murdered them, but rather that he "felt responsible" for their deaths because "his actions"—namely, fighting with Welch—ultimately led to that outcome. That was

also what he meant in his suicide note. Petitioner denied ever admitting that he started the fire. He also testified that he kept a spare can of gasoline in the storage closet in the bathroom, along with some other auto parts; and he reiterated that the gasoline smell in his car was caused by a bad fuel injector, as he told the officer at the time.

¶ 12    The trial court sentenced petitioner to life imprisonment, the mandatory sentence for a double murder. 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2022). Petitioner was 21 years old when he killed Welch and Cruz-Reyes. But trial counsel argued that compared to a juvenile, petitioner's age was a "distinction without a difference," particularly in light of his social history and lack of a stable home growing up, as detailed in his PSI. Citing *Miller v. Alabama*, 567 U.S. 460 (2012), counsel asked the trial court to "disregard the statutory restriction" on the court's sentencing discretion and impose a term of years. Counsel argued that our own cases require a defendant's age to be considered on "a case-by-case basis when you got somebody of younger years."

¶ 13    Because petitioner was 21, the trial court held that *Miller* did not apply and that the only permissible sentence was mandatory natural life. Counsel filed a motion to reconsider sentence, based again on the eighth amendment as construed by *Miller*. Neither the motion to reconsider nor the argument at the sentencing hearing ever mentioned the proportionate penalties clause of the Illinois Constitution.

¶ 14    Petitioner did not challenge his sentence on direct appeal. After our decision affirming his convictions, he filed a timely *pro se* postconviction petition, which the circuit court dismissed at the first stage. Two of the *pro se* claims remain at issue in this appeal. First, as appellate counsel frames the issue, petitioner's mandatory life sentence violates the proportionate penalties clause of the Illinois Constitution, based on petitioner's "youthful" age of 21 at the time of the murders. Second, the petition alleges that trial counsel was ineffective for failing to interview Bobadilla,

Luna, or Xavier Ruiz, and for failing to obtain surveillance footage from nearby police cameras.

¶ 15                                            ANALYSIS

¶ 16                              I. Proportionate Penalties Clause

¶ 17    Petitioner claims his mandatory natural-life sentence for the murders of Welch and Cruz-Reyes arguably violates the proportionate-penalties clause of the Illinois Constitution. See Ill. Const. 1970, art. I, § 11. The crux of his argument is that Illinois's proportionate-penalties jurisprudence has extended the reasoning of *Miller* to "youthful offenders" who are over the age of 18, but who still qualify as "late adolescents" or "emerging adults." *People v. Harris*, 2018 IL 121932, ¶¶ 45-48 (18-year-old could raise as-applied challenge); *People v. Thompson*, 2015 IL 118151, ¶¶ 43-44 (same for 19-year-old). As a 21-year-old, the argument goes, petitioner falls into this category. Thus, his youthful age, coupled with the history and background detailed in his PSI, state the gist of an as-applied challenge under the proportionate-penalties clause.

¶ 18    The parties dispute, as a threshold matter, whether the *pro se* petition raises this claim at all. As the State points out, petitioner—as opposed to appellate counsel—alleged in his pleading that his sentence violates the eighth amendment, not the proportionate-penalties clause; and that direct-appeal counsel was ineffective for failing to "preserve" the eighth-amendment issue that was raised below. The *pro se* petition mentions the proportionate penalties-clause only in the context of an allegation that the truth-in-sentencing statute violates this state-constitutional provision. That is a separate argument, and one that will not save petitioner from the forfeiture alleged by the State. *People v. Watson*, 2022 IL App (1st) 192182, ¶¶ 30-34.

¶ 19    On petitioner's side of the ledger, there are the familiar principles that a *pro se* petition is to be liberally construed—and need only the state the "gist" of a claim, which is "something less than a completely pled or fully stated claim." *People v. Edwards*, 197 Ill. 2d 239, 245 (2001).

And since a "*pro se* defendant \*\*\* will, in all likelihood, be unaware of the precise legal basis for his claim or all the legal elements of that claim," "a *pro se* petition is not required to include legal argument or citation to legal authority." *Edwards*, 197 Ill. 2d at 245; see *People v. Brown*, 236 Ill. 2d 175, 184 (2010).

¶ 20    What's more, youth-based sentencing claims are ultimately based on the same kinds of considerations whether they are brought under the proportionate-penalties clause or the eighth amendment. The necessary substantive allegations are largely the same under the two provisions; the principal difference is that the age limit for viable claims is higher under the proportionate-penalties clause, which extends the *Miller* protections to at least some "young adult" defendants who have passed their 18th birthdays. *Harris*, 2018 IL 121932, ¶¶ 45-48; *Thompson*, 2015 IL 118151, ¶¶ 43-44. The claims are so closely intertwined that our cases routinely speak of "*Miller* claim[s]" or "*Miller*-based claims" brought under the proportionate-penalties clause. See, *e.g.*, *People v. Kruger*, 2021 IL App (4th) 190687, ¶ 29; *People v. Humphrey*, 2020 IL App (1st) 172837, ¶ 33, *abrogated on other grounds by People v. English*, 2023 IL 128077.

¶ 21    Given the liberal pleading standards of the first stage, we are reluctant to hold that a *pro se* petitioner forfeits any proportionate-penalties claim, or pleads himself out of court, by citing only the eighth amendment as the basis for an age-based or "*Miller* based" sentencing claim that is otherwise adequately pleaded. (To be clear, our doubts are confined to *pro se* petitioners and do not apply to second-stage counsel.) At the same time, we must acknowledge that the case for forfeiture is stronger here than, say, a *pro se* petition that mistakenly cites the sixth-amendment right to counsel instead of the fifth-amendment *Miranda* right to counsel. It is one thing for a *pro se* petitioner to cite the wrong constitutional *provision*. But here, appellate counsel would have us proceed under a different *constitution* altogether, from a different jurisdiction, than the one cited

in the *pro se* pleading. All in all, whether the liberal pleading standards of the first stage are enough to keep petitioner in the appellate game is a close call.

¶ 22    But we need not decide the question in this case. Nor must we consider whether the record was sufficiently developed at the sentencing hearing for petitioner's claim to be heard on direct appeal—or for that matter, here. And we can put aside any question whether the claim comes to us now with the appropriate *Strickland* allegations. However we might answer these questions, we would still conclude that petitioner's claim fails as a matter of law.

¶ 23    "The vast majority of our cases have drawn a bright line at 21 years old in determining who qualifies as a 'young adult offender'" for purposes of a '*Miller* claim' " brought under the proportionate-penalties clause. *People v. Montanez*, 2022 IL App (1st) 191930, ¶ 55 (quoting *Humphrey*, 2020 IL App (1st) 172837, ¶ 33). Indeed, we have drawn this line several times in precedential decisions. *People v. Green*, 2022 IL App (1st) 200749, ¶ 30-42; *Montanez*, 2022 IL App (1st) 191930, ¶ 58; *People v. Kruger*, 2021 IL App (4th) 190687, ¶¶ 31-33; *Humphrey*, 2020 IL App (1st) 172837, ¶ 33; *People v. Suggs*, 2020 IL App (2d) 170632, ¶¶ 30-44.

¶ 24    We adhere to this "bright line" today, for the reasons explained in our decisions. Briefly: the criminal law may treat legal adults, aged 18 to 20, as juveniles for certain purposes—for example, juvenile court jurisdiction, recidivist sentencing, and parole eligibility. See, respectively, 705 ILCS 405/1-3(10), 5-105(10) (West 2022); 730 ILCS 5/5-4.5-95(b) (West 2022); *id*. § 5-4.5-115(b). But we are not aware of any context in which the criminal law, or societal consensus in general, treats a 21-year-old as a juvenile for any purpose at all. See *Suggs*, 2020 IL App (2d) 170632, ¶ 35 (noting that defendant could not "point to any line, societal, legal, or penological, that is older than 21 years"). In short, the 21st birthday currently stands as the outer marker of legal adulthood. If the rationale and protections of *Miller* are to be extended

beyond that outer marker, based on recent and evolving research in neuroscience and psychology, that extension will have to come from our legislature or supreme court. *Kruger*, 2021 IL App (4th) 190687, ¶ 33; see also *People v. Rivera*, 2020 IL App (1st) 171430, ¶ 27 (legislature and supreme court "are in a better position to draw clear, predictable and uniform lines" that "must be drawn" in this area) (quoting *People v. Buffer*, 2019 IL 122327, ¶ 40). It is not the prerogative of an intermediate appellate court.

¶ 25     And our supreme court has expressed skepticism about this proposed extension of *Miller*-based claims in a recent decision. In *People v. Williams*, 2024 IL 127304, ¶ 1, decided after this case was briefed, a 22-year-old defendant was sentenced to mandatory natural life under the multiple-murder statute. His *pro se* petition alleged that his sentence violated the proportionate-penalties clause, on the ground that evolving neuroscience supports treating "emerging adult defendants" like him as juveniles for sentencing purposes. *Id.*

¶ 26     The supreme court decided the case on a narrow factual ground: the claim lacked "an arguable basis in fact" as pleaded in the petition. *Id.* ¶ 29. Thus, the court did not reach the question whether a defendant who has reached 21 years of age (or older) could have a viable *Miller*-based claim under the proportionate-penalties clause. But the supreme court did observe that the defendant's age "itself casts doubt on the validity of his claim." *Id.*

¶ 27     There is one—and only one—precedential decision that supports petitioner's claim. In *People v. Savage*, 2020 IL App (1st) 173135, this court held that a 22-year-old petitioner pleaded a *Miller*-based proportionate penalties claim and remanded for second-stage proceedings. For the reasons discussed above, we would not follow that decision and instead would join the numerous other decisions that keep the "bright line" at age 21 unless and until our supreme court or the legislature dictates otherwise.

¶ 28    Appellate counsel notes, however, that the standard at the first stage of a postconviction petition is simply whether the allegations state the "gist" of a constitutional claim; the petition should be dismissed only if it is frivolous—and if even one appellate decision supports the claim, it should not be deemed frivolous. See *People v. Zumot*, 2021 IL App (1st) 191743, ¶ 39.

¶ 29    That is generally true, but we are not inclined to advance this petition for the simple reason that the basis of our ruling is a pure question of law, of constitutional interpretation, that will remain unchanged by anything counsel might offer in second-stage proceedings. It will achieve nothing, other than wasting judicial resources (and perhaps filling petitioner with false hope) to defer our conclusion until a second appeal on this same issue, based on nothing more than the existence of a single outlier case whose reasoning we do not embrace.

¶ 30    At the age of 21, petitioner was fully a legal adult when he murdered Welch and Cruz-Reyes. As the law stands, he does not have a legally cognizable *Miller*-based claim under the proportionate-penalties clause. For this reason alone, his claim fails.

¶ 31                              II. Ineffective assistance

¶ 32    Petitioner also claims his trial counsel was arguably ineffective for failing to interview Luna, Bobadilla, or Xavier Ruiz, and for failing to obtain video surveillance footage from nearby police cameras. He alleges that the witnesses and video would have supported his trial testimony that it was Bobadilla who strangled Cruz-Reyes (while he choked but did not kill Welch) and then set the apartment on fire (while he waited outside).

¶ 33    In short, petitioner says, Luna would have testified that the murder victims assaulted her in the course of a rent dispute. So too for Bobadilla, who also would have refuted the State's theory that she freely shared her cellphone with petitioner. Xavier Ruiz, who testified for the State, would have corroborated petitioner's testimony that he stored gasoline cans in the

apartment and that his car smelled of gasoline because of a known engine problem. Lastly, the surveillance video, located in a nearby alley, would have shown petitioner outside the apartment, for 15 minutes, waiting for Bobadilla to emerge.

¶ 34    We begin with counsel's alleged failure to interview the named witnesses. Petitioner did not attach any of their affidavits. His only explanation was that he could obtain them "due to his current incarceration and the fact that he is indigent."

¶ 35    Petitioner thus failed to comply with section 122-2 of the Post-Conviction Hearing Act, which requires him to attach "affidavits, records, or other evidence supporting its allegations" or "state why the same are not attached." 725 ILCS 5/122-2 (West 2022). Our supreme court has long held that under section 122-2, " '[a] claim that trial counsel failed to investigate and call a witness must be supported by an affidavit from the proposed witness.' " *People v. Harris*, 224 Ill. 2d 115, 142 (2007) (quoting *People v. Enis*, 194 Ill. 2d 361, 380 (2000)).

¶ 36    A petitioner must do more than provide his own affidavit or otherwise allege "what the[ ] witnesses would have said." *Id*. The petitioner's own allegations are "mere speculation" that imputes to the proposed witness "merely what defendant wished [the witnesses] would say." *Id.* Without an affidavit—or other objective corroboration of the proffered testimony—a court "cannot determine whether the proposed witness could have provided testimony or information favorable to the defendant, and further review of the claim is unnecessary." *Id.*

¶ 37    Petitioner argues that *People v. Dupree*, 2018 IL 122307, ¶ 34, disavowed any "bright-line rule" requiring an affidavit in support of a claim that counsel failed to investigate or call a witness. Fair enough. But the petitioner in *Dupree* attached "three signed, handwritten statements that [the witness] had given to the police," in which the witness identified someone other than the defendant as the shooter. *Id.* ¶¶ 19, 41.

¶ 38    "[U]nlike the typical case," the defendant in *Dupree* "did not hope to introduce new evidence that could only be verified by an affidavit from the proposed witness;" rather, he "wanted to introduce evidence that already existed," and merely needed counsel to call a known witness so that his statements would not languish, unused, as "inadmissible hearsay." *Id.* ¶ 42. In other words, the witness's statements were proof enough of the exculpatory testimony that counsel failed to present to the jury. *Id.* ¶¶ 40-42. And that is why an affidavit from the witness was unnecessary.

¶ 39    This case is not at all like *Dupree*. To the contrary, it is what *Dupree* called "the typical case," one in which the petitioner faults counsel for not discovering and introducing *new* witness testimony that can only be corroborated by an affidavit (or similar objective evidence) from the proposed witness. Nothing in *Dupree* even remotely suggests that a petitioner's uncorroborated allegations are an adequate substitute for a witness affidavit attesting to the proposed testimony. (The same goes for *People v. Thompkins*, 161 Ill. 2d 148, 163 (1994), a case discussed at some length in *Dupree* and cited here by petitioner.) And petitioner offers nothing more than his own uncorroborated allegations about the testimony that Luna, Bobadilla, and Xavier supposedly would have offered. Those allegations do not suffice.

¶ 40    Nor does petitioner's explanation for his failure to obtain the witness's affidavits. See 725 ILCS 5/122-2 (West 2022). As noted, he attributes this failure "to his current incarceration and the fact that he is indigent." He does not cite, and our research has not revealed, any case holding that this explanation satisfies section 122-2. As post-conviction petitioners are overwhelmingly "likely to be imprisoned," and the Act expressly "contemplates" as much (*id*. § 122-1(a)), holding that a petitioner's indigence and incarceration alone excuse a failure to attach the

necessary supporting materials would render this statutory requirement all but "meaningless." *People v. Harris*, 2019 IL App (4th) 170261, ¶ 19.

¶ 41　These same points apply to the alleged police surveillance video. Petitioner asserts that a video from a nearby police camera would show him standing outside the apartment building while Bobadilla was still inside, allegedly setting it on fire. Petitioner did not attach the video. He admitted that he never saw the video whose alleged contents he purports to describe. He did not include any objective evidence, of any kind, confirming that such a video exists. Nor did he explain why he could not do so, beyond once again citing the general fact of his indigence and incarceration. His claim is based on nothing more than his own uncorroborated allegation about a video that may or may not exist. Lacking any evidentiary support, or an adequate explanation for its absence, the claim thus fails to comply with section 122-2.

¶ 42　　　　　　　　　　　　　　　CONCLUSION

¶ 43　We affirm the judgment of the circuit court.

¶ 44　Affirmed.